853 So.2d 8 (2003)
STATE of Louisiana
v.
Quincy BROWN.
No. 2002-KA-1217.
Court of Appeal of Louisiana, Fourth Circuit.
May 28, 2003.
Rehearing Denied September 9, 2003.
Harry F. Connick, District Attorney, Donna R. Andrieu, Assistant District Attorney, *9 New Orleans, LA, for Plaintiff/Appellee.
Clive Stafford Smith, Stephen I. Singer, Louisiana Crisis Assistance Center, New Orleans, LA, for Defendant/Appellant.
(Court composed of Chief Judge WILLIAM H. BYRNES III, Judge TERRI F. LOVE, Judge EDWIN A. LOMBARD).
EDWIN A. LOMBARD, Judge.

STATEMENT OF CASE
On May 10, 1999, Quincy Brown was charged by bill of information with a violation of La. R.S. 14:27(30), relative to the attempted first degree murder of Alvin Harris on March 17, 1999 (Count One); a violation of La. R.S. 14:64, relative to the March 11, 1999 armed robbery of Wayne Matthews (Count Two); a second violation of La. R.S. 14:27(30), relative to the February 7, 1999 attempted first degree murder of Leonard Jordan (Count Three); and a violation of La. R.S. 14:65, relative to the March 15, 1999 simple robbery of Yul Knighten (Count Four). Mr. Brown's case was received in Section "F" and transferred to Section "H" on May 14, 1999 to follow Case No. 406-784 in which he was charged with first degree murder.[1]
Mr. Brown pled not guilty at the arraignment on May 27, 1999. On August 6, 1999, the trial court heard testimony on defendant's motion to suppress the identification in Counts Two and Four (the armed robbery and simple robbery charges). The court denied the motion on count two and left the matter open as to Count Four. On August 18, 1999, defendant filed a motion to quash the indictment or, alternatively, to sever the counts in the indictment. The court heard testimony on defendant's motion to suppress the identification on the remaining counts and continued the matter. On October 15, 1999, the court resumed the suppression hearing on the motions to suppress identification. The trial court denied the motion to suppress as to Count Three, and the court denied the motion as to Count One and Four as moot. The court also denied the motion to quash or to sever the counts. The writ was denied by this court and similarly denied by the Louisiana Supreme Court.
On October 15, 1999, the trial court, after hearing, denied Mr. Brown's Motion to Suppress the Identification with respect to Count Three, and denied in part the Motion to Suppress the Identification with respect to Count Four.
On July 28, 1999, the trial court granted defendant's ex parte Motion for Appointment of Second Counsel naming Harold Ducloux as second counsel, who represented Mr. Brown on July 28, 1999 and through sentencing. Mr. Brown was also represented by Dwight Doskey of the Orleans Indigent Defender Program.
On November 9, 1999, defense counsel Marie Scavetta filed a motion to compel disclosure. On December 14, 1999 the court heard testimony on discovery matters and defendant reurged the motion for severance. On January 13, 2000, the trial court granted attorney Marie Scavetta a motion to withdraw as counsel and granted attorney Stephen Singer's motion to appear pro hac vice in the matter. On February 8, 2000, defendant filed a second motion to quash the indictment or, in the alternative, for severance. On March 1, 2000, the court heard argument, and the *10 trial court denied the motion. Defendant filed a notice of intent to seek writs and to stay the proceedings. The trial court denied the motion for stay. On May 3, 2000, this court denied defendant's writ application on the showing made. State v. Brown, XXXX-XXXX, unpub. (La.App. 4 Cir. 5/3/00), stay denied, XXXX-XXXX (La.5/3/00), 760 So.2d 1184, writ denied, XXXX-XXXX (La.6/30/00), 767 So.2d 42.
On January 26, 2001, the trial court granted the State's motion to remove Mr. Singer from representation in the first degree murder case and appointed Clive Stafford Smith, also of the Louisiana Crisis Assistance Center, to represent Mr. Brown. Apparently, there was some confusion over whether Mr. Singer had been removed from this case. A hearing on the issue was conducted May 4, 2001 after which Mr. Smith enrolled as counsel. Defendant sought review in this court regarding the removal of Stephen Singer as co-counsel and this court found that while there was nothing to indicate that Mr. Singer had been removed from the instant case in January, this court found on the basis of its previous ruling in an unrelated writ, State v. Landry, 2000-2414, unpub. (La.App. 4 Cir. 1/9/01), that he should be removed because his presence in Louisiana courts practicing as an out-of-state attorney had been ongoing for so long that he was no longer qualified to appear pro hac vice. State v. Brown, XXXX-XXXX, unpubl. (La.App. 4 Cir. 6/01/01). Defendant sought review in the Louisiana Supreme Court, and the court remanded the case to allow Mr. Singer to demonstrate that he was "temporarily present in this state" and whether he possessed the professional competence and ethical responsibility of an attorney admitted to practice in Louisiana. State v. Landry, XXXX-XXXX, XXXX-XXXX (La.6/29/01), 791 So.2d 630. Thereafter, defendant filed a motion to recuse Judge Buras. The motion was denied on July 13, 2001. This court denied defendant's writ. State v. Brown, XXXX-XXXX, unpub. (La.App. 4 Cir. 8/15/01). On August 9, 2001, defendant filed a motion to stay the hearing on Mr. Singer pending the outcome of the bar examination.
On May 4, 2001, the trial court granted the State's motion to remove Mr. Singer as counsel of record. On May 4, 2001, Clive Stafford Smith enrolled as Mr. Brown's counsel, replacing Mr. Singer as co-counsel.
On September 28, 2001, defendant filed a motion to preclude exclusion of jurors. Prior to trial, Leonard Jordan was held on a material witness bond. On October 2, 2001, Mr. Brown withdrew all former pleas regarding Count Four and entered a plea of "guilty as charged" of the simple robbery of Yul Knighten. The case then proceeded to trial, and the jury, on October 3, 2001, found the defendant guilty as charged of the armed robbery of Wayne Matthews (Count Two) and not guilty of the attempted murder of Leonard Jordan (Count Three). The State entered a nolle prosequi with regard to Count One, the attempted first degree murder of Alvin Harris.
On January 18, 2002, the trial court sentenced the defendant to serve 99 years at hard labor without benefit of parole. The defendant objected to the sentence as excessive. On June 21, 2002, the court found the defendant to be a second felony offender and sentenced him to 198 years at hard labor without benefit of parole. The defendant objected to the sentence as excessive. The court granted his motion for appeal.
STATEMENT OF FACT
Wayne Matthews testified that on March 11, 1999, he was the victim of an armed robbery. Mr. Matthews was in his car when the defendant entered. Initially, *11 he believed that the defendant was joking. He tried talking to the defendant for some ten minutes as he slowly drove his car. Mr. Matthews related that he knew Mr. Brown, as he had previously been introduced to him and that Mr. Brown was frequently at the house of a female friend of his. Mr. Matthews did not see the gun until the defendant was about to exit the car. After Mr. Matthews saw the gun, Mr. Brown asked him for his wallet. Mr. Matthews gave him the wallet and then ran. As he ran he heard a shot and then heard his car being driven off.
Mr. Matthews returned home and called the police. Sometime later, after the police had failed to arrive, Mr. Matthews called again. The two 911 tapes were played for the jury. In the second tape, Mr. Matthews identified his assailant as "Quincy." Mr. Matthews positively identified the defendant in court as the man who had robbed him.
Officer Henry Hollins arrived at the victim's house that night to take a report. Officer Hollins stated that Mr. Matthews identified the perpetrator as someone known to him by the name of Quincy. The officer and Mr. Matthews proceeded to the location of the robbery. Officer Hollins attempted to locate a shell casing but was unsuccessful. While the two were in the area, Mr. Matthews observed his car drive by with two subjects in it. Officer Hollins and Mr. Matthews pursued the vehicle and the two subjects were apprehended. Mr. Matthews stated that neither subject was the perpetrator of the armed robbery.
The day after the robbery, a friend of Mr. Matthews discovered a crack pipe underneath the seat of his car. Mr. Matthews telephoned the police to inform them of his discovery. He related that he was told to throw the pipe away, which he did.
Detective John Duzac testified that he was assigned to conduct the follow up investigation of Mr. Matthews' robbery. He compiled a photographic lineup and presented the photos to Mr. Matthews for identification. Mr. Matthews identified the defendant and signed and dated the back of the photograph.
Sergeant Gus Bethea testified that on February 7, 1999 he assisted in the investigation of a shooting in the Fischer Housing Project. Sergeant Bethea related that three males had been shot and that one had suffered a serious gunshot wound to the throat. Sergeant Bethea related that the other two victims were uncooperative.
Leonard Jordan testified that he was the victim of the shooting which occurred on February 7, 1999. He stated that he had been shot in the jugular and that he had sustained paralysis in the left hand. Mr. Jordan had been at a club that night and had gotten a ride with several people in a van. He recalled getting out of the car in the Fischer Housing Project, but he stated that he could not recall what happened afterwards. Mr. Jordan testified that he had no knowledge of who had shot him that night. He stated that he had blanked out any memory of the shooting from his mind. Mr. Jordan examined a photographic lineup bearing his purported signature on the back of a photograph of the defendant and stated that he was not sure whether that was his signature, although he acknowledged it was similar. He stated that he could not remember whom he had identified. Mr. Jordan acknowledged that he and the defendant were acquaintances.
ERRORS PATENT
A review of the record for errors patent reveals none.
*12 ANALYSIS
Excessive Sentence
Defendant challenges the constitutionality of his multiple offender adjudication and asserts that his sentence is excessive. Citing Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) and United States v. Tighe, 266 F.3d 1187 (9th Cir.2001), defendant contends that the federal jurisprudence supports the conclusion that a juvenile conviction in which the defendant has not been afforded the right to a trial by jury cannot be used to enhance a defendant's sentence.
The Supreme Court in Apprendi stated that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490, 120 S.Ct. 2348. The Court in Apprendi elaborated on the importance of procedural protections being inherent in prior convictions used as sentencing factors to increase statutory penalties:
There is a vast difference between accepting the validity of a prior judgment of conviction entered in a proceeding in which the defendant had the right to a jury trial and the right to require the prosecutor to prove guilt beyond a reasonable doubt, and allowing a judge to find the required fact under a lesser standard of proof.
Apprendi 530 U.S. at 496, 120 S.Ct. 2348.
Apprendi was convicted pursuant to a guilty plea of two counts of second-degree possession of a firearm for an unlawful purpose and one count of third-degree unlawful possession of an antipersonnel bomb. The two offenses carried a penalty range of between three to ten years. Additionally, however, the State reserved the right to enhance the sentence under the hate crime statute on the ground that the shooting was committed with a biased purpose. The hate crime statute authorized an extended term of between 10 and 20 years. The issue before the Supreme Court was whether the Due Process Clause of the Fourteenth Amendment required that a factual determination authorizing an increase in the maximum prison sentence for an offense from 10 to 20 years be made by a jury on the basis of proof beyond a reasonable doubt. The Court reversed the New Jersey Supreme Court's judgment, which had affirmed the enhancement of the prison sentence within the extended range. The United States Supreme Court held that because Apprendi did not receive a jury trial under the prescribed standard of proof, his sentence violated his constitutional due process rights. In Apprendi, however, the Court did not address the issue of prior juvenile adjudications.
As background, Congress has characterized juvenile adjudications as "prior convictions" under the Armed Career Criminal Act of 1984 ("ACCA"), 18 U.S.C. § 924(e)(2)(B), (e)(2)(C). But, whether juvenile convictions can be characterized as "prior convictions" under a due process review as mandated by Apprendi is a constitutional question; i.e., the defendant's right not to be deprived of his liberty without due process of law.
In Tighe, supra, the U.S. Ninth Circuit Court of Appeals applied Apprendi's holding to prior juvenile convictions. The Court in Apprendi had concluded that the "`prior conviction' exception is limited to prior convictions resulting from proceedings that afforded the procedural necessities of a jury trial and proof beyond a reasonable doubt" and the Ninth Circuit concluded, as a result, that the "prior conviction" exception does not include nonjury, juvenile adjudications. 266 F.3d at 1194.
*13 In arriving at its conclusion, the Ninth Circuit in Tighe reviewed additional United States Supreme Court jurisprudence noting that neither Apprendi nor Almendarez-Torres, infra specifically addressed the unique issues distinguishing juvenile convictions from adult convictions. Specifically, in Almendarez-Torres v. United States, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), the Supreme Court held that the fact of the prior conviction was a sentencing factor, and not a separate element of the crime to be charged in the indictment. Id. at 243, 118 S.Ct. 1219. Subsequently, during the next term, the Court in Jones v. United States, 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999), considered its holding in Almendarez-Torres regarding the use of prior convictions in the context of emerging concern regarding the use of certain facts to increase the defendant's exposure to a statutory penalty not charged in the indictment nor proved beyond a reasonable doubt before a jury. The Court explained the distinction between prior convictions as opposed to other sentencing-enhancing facts as follows:
One basis for that constitutional distinctiveness [of prior convictions] is not hard to see: unlike virtually any other consideration used to enlarge the possible penalty for an offense ... a prior conviction must itself have been established through procedures satisfying the fair notice, reasonable doubt and jury trial guarantees.

Jones, 526 U.S. at 249, 119 S.Ct. 1215 (emphasis added).
The Ninth Circuit in Tighe focused on the Supreme Court's emphasis in Apprendi (quoted above from Apprendi, 530 U.S. at 496, 120 S.Ct. 2348), which followed Jones in the 2000 term, stressing the necessity for the procedural mechanisms of a jury trial and the standard of beyond a reasonable doubt when increasing the statutory maximum of a sentence. The appellate court concluded:
Thus, as we read Jones and Apprendi, the "prior conviction" exception to Apprendi general rule must be limited to prior convictions that were themselves obtained through proceedings that included the right to a jury trial and proof beyond a reasonable doubt. Juvenile adjudications that do not afford the right to a jury trial and a beyond-a-reasonable-doubt burden of proof, therefore, do not fall within Apprendi's "prior conviction" exception.
....
In sum, we conclude Apprendi's narrow "prior conviction" exception is limited to prior convictions resulting from proceedings that afforded the procedural necessities of a jury trial and proof beyond a reasonable doubt.
Tighe, 266 F.3d at 1194.
Not all federal appellate courts have concluded similarly, however. In United States v. Smalley, 294 F.3d 1030 (8th Cir.2002) the identical issue was raised, and the court declined to follow Tighe, writing:
We respectfully disagree with the Tighe court's conclusion. The Supreme Court stated in Apprendi that prior convictions are excluded from the general rule because of the "certainty that procedural safeguards," such as trial by jury and proof beyond a reasonable doubt, undergird them. Apprendi, 530 U.S. at 488, 120 S.Ct. 2348. The Court went on to state that "there is a vast difference between accepting the validity of a prior judgment of conviction entered in a proceeding in which the defendant had the right to a jury trial and the right to require the prosecutor to prove guilt beyond a reasonable doubt," on the one hand, and accepting the validity of findings of facts by judges that are subject to a lesser standard of proof, on the other. Id. at 496, 120 S.Ct. *14 2348. We think that while the Court established what constitutes sufficient procedural safeguards (a right to jury trial and proof beyond a reasonable doubt), and what does not (judge-made findings under a lesser standard of proof), the Court did not take a position on possibilities that lie in between these two poles. In other words, we think that it is incorrect to assume that it is not only sufficient but necessary that the "fundamental triumvirate of procedural protections," as the Ninth Circuit put it, underly an adjudication before it can qualify for the Apprendi exemption.
We do not think, moreover, that Jones meant to define the term "prior conviction" for constitutional purposes as a conviction "that has been established through procedures satisfying fair notice, reasonable doubt and jury trial guarantees." 526 U.S. at 249, 119 S.Ct. 1215. We read Jones instead to mean that if prior convictions result from proceedings outfitted with these safeguards, then they can constitutionally be used to increase the penalty for a crime without those convictions being submitted and proved to a jury. Our confidence in this reading is bolstered by the fact that in explaining the exception for prior convictions, the Apprendi court itself talks about only the right to a jury trial and proof beyond a reasonable doubt. We think it notable, moreover, that Apprendi does not even refer to the language in Jones, quoted above, upon which the Tighe court based its conclusion.
In any case, we conclude that the question of whether juvenile adjudications should be exempt from Apprendi's general rule should not turn on the narrow parsing of words, but on an examination of whether juvenile adjudications, like adult convictions, are so reliable that due process of law is not offended by such an exemption. We believe that they are.
For starters, juvenile defendants have the right to notice, the right to counsel, the right to confront and cross-examine witnesses, and the privilege against self-incrimination. See In re Winship, 397 U.S. 358, 368, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). A judge in a juvenile proceeding, moreover, must find guilt beyond a reasonable doubt before he or she can convict. See id. We think that these safeguards are more than sufficient to ensure the reliability that Apprendi requires. This conclusion finds at least some support in those cases, in both our circuit and the Ninth Circuit, that hold that juvenile sentences may be used to enhance a defendant's sentence within a prescribed statutory range. See United States v. Early, 77 F.3d 242, 244-45 (8th Cir.1996) (per curiam); United States v. Williams, 891 F.2d 212, 214-15 (9th Cir.1989), cert. denied, 494 U.S. 1037, 110 S.Ct. 1496, 108 L.Ed.2d 631 (1990). Finally, while we recognize that a jury does not have a role in trials for juvenile offenses, we do not think that this fact undermines the reliability of such adjudications in any significant way because we think that the use of a jury in the juvenile context would "not strengthen greatly, if at all, the fact-finding function" and is not constitutionally required. See McKeiver v. Pennsylvania, 403 U.S. 528, 547, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971) (plurality opinion).
We therefore conclude that juvenile adjudications can rightly be characterized as "prior convictions" for Apprendi purposes, and that the district court did not err in increasing Mr. Smalley's sentence based on his prior juvenile adjudications.
Smalley, 294 F.3d at 1030-32.
Although federal jurisprudence is merely persuasive, the underlying rationale is *15 instructive. The Louisiana Supreme Court has yet to deal squarely with the issue of whether the use of juvenile adjudications to enhance a statutory penalty is constitutionally permissible. Recently, however, the Louisiana Supreme Court addressed the question of whether the juvenile should be allowed a trial by jury and other similar rights. See State in the Interest of D.J., 01-KA-2149 (La.5/14/02), 817 So.2d 26. Our supreme court concluded that such rights need not be permitted in juvenile proceedings, but strongly hinted that this difference in adjudication procedures might require the exclusion of such adjudications from later enhancement proceedings:
In United States v. Tucker, 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972) and Burgett v. Texas, 389 U.S. 109, 88 S.Ct. 258, 19 L.Ed.2d 319 (1967), the Supreme Court prohibited the use of prior convictions that were entered without the advice of counsel to enhance later sentences. In a related vein, some commentators suggest that the practice of using juvenile convictions obtained without the option to be tried by a jury to enhance adult sentences renders the juvenile system unconstitutional. See e.g., Sara E. Kropf, Note, Overturning McKeiver v. Pennsylvania: The Unconstitutionality of Using Prior Convictions to Enhance Adult Sentences Under the Sentencing Guidelines, 87 Geo. L.J. 2149 (1999); David Dormont, Note, For the Good of the Adult: An Examination of the Constitutionality of Using Prior Juvenile Adjudications to Enhance Adult Sentences, 75 Minn. L.Rev. 1769, 1793-94 (1991).
Id. at p. 4, n. 6; 817 So.2d at 37, n. 6.
We conclude that the rationale articulated by the Ninth Circuit in Tighe, as opposed to the Eighth Circuit's converse reasoning in Smalley, is more in line with the minimal guidance provided thus far by our highest court in State in the Interest of D.J., supra. Therefore, we hold that prior juvenile adjudications that resulted absent a jury trial are constitutionally inadequate under the Apprendi exception for purposes of subsequent sentence enhancement.
In the instant case, the juvenile matter was heard by a judge, not a jury. The juvenile court, however, did employ the requisite beyond-a-reasonable-doubt standard. The defense asserts that the circumstances of that conviction (for attempted second degree murder) demonstrate the problem with considering a juvenile conviction as an Apprendi exception. Following is Quincy Brown's statement when he was adjudicated at the age of fourteen:
I was at Diana and Verret St. across from the church when Lowdown [Ron Brown] walked up. He was talking to [a] boy named Leroy in a car and he had seen [me] and he asked if I had seen Syble. I told him that the last time I had seen her was around the corner. He said come on and let's go walk around there, I have to ask her something. He said for me to go on around the corner and tell her to meet him at the corner. I went around by Belleville St. and found her and told her that Lowdown wanted to tell her something. She ask me where he was at and I told her that he was around the corner. She said where at and I told her that he was at the side street by Socrates and Belleville St. She told me to walk her to the corner so I walked to the corner and then I went back to where I was. I heard shooting from Belleville and Socrates St. I ran back around the re and asked Johnny and Bebe what happened. They didn't know so I went to the corner where everybody was standing. I saw Syble stumbling around and I asked her what had happened. She told me to leave her *16 alone. And she was falling and I picked her [up] and her face was bloody. She told me ["]Lowdown shot me." I walked her to her sister in law house. The man there wouldn't call an ambulance. I walked her back to Diana and Vallette St. and I told Damien to go call an ambulance and I went to wash the blood off my hand.
Defense argues, correctly, that the above statement from the defendant at the age of 14 indicates that there was no evidence that Quincy Brown participated in the crime resulting in the girl's death. In fact, the statement indicates instead that Quincy Brown tried to help the victim. Yet, Quincy Brown was adjudicated guilty of attempted second degree murder.
Paradoxically, Lowdown Brown (no relation to Quincy Brown) was tried before a jury because he was an adult at the time of the crime and the jury acquitted Lowdown. Yet Quincy Brown, with no evidence of being an accessory to anyone, was adjudicated as guilty by a judge and sent to juvenile prison. To use such a defective juvenile adjudication to constitute a "prior conviction" for purposes of the Apprendi exception, and allow such prior conviction to be used to enhance the statutory penalty for Quincy Brown's instant offense is constitutionally improper.
We conclude on this issue of excessive sentence that the trial court erred in enhancing the sentence of the defendant on the basis of the prior juvenile conviction. Accordingly, we reverse and remand for re-sentencing consistent with this opinion.

Validity of the Conviction
Defense counsel asserted numerous non-constitutional assignments of error, which challenge the validity of the conviction and summarizes in brief that even if none of the assignments constitute sufficient grounds for reversal, taken together the various alleged errors would serve to be a cumulative error warranting reversal. We disagree. Reviewing the various alleged trial court errors, we find the only allegations with merit to be the following, and the two improper admissions constituted harmless error because the evidence was sufficient to convict the defendant irrespective of these two.
The trial court erred in admitting the 911 tape and arrest warrant, both of which were used for the truth of the matter asserted and thereby constituted hearsay. This evidentiary error, however, was harmless error because there existed sufficient additional evidence that Quincy Brown committed the crime for which he was charged. If hearsay testimony is improperly admitted into evidence, it may be considered harmless error if the reviewing court determines that it did not contribute to the verdict. State v. Hearold, 603 So.2d 731, 739 (La.1992). All the information included on the search warrant was received by the court through competent evidence. Thus, the arrest warrant, if indeed it constituted hearsay, was merely cumulative and non-prejudicial.
Similarly, the recording of the 911 emergency calls were also cumulative. Mr. Matthews, the victim, and Officer Hollins both testified as to the contents of the tape recording. Also, there was full opportunity for cross-examination. Therefore, the admission of the tapes was harmless error.
CONCLUSION
For the foregoing reasons, we affirm the convictions, but reverse the sentence as constitutionally excessive. We remand the matter to the trial court for re-sentencing consistent with this opinion.
CONVICTION AFFIRMED; SENTENCE REVERSED; REMANDED.
NOTES
[1] The defendant ultimately pled guilty to the reduced charge of manslaughter on January 28, 2002. See State v. Brown, 2001-2463 (La.4/12/02), ___ So.2d ___, 2002 WL 576176.