| JOAN BERNARD ARMSTRONG, Chief Judge.

STATEMENT OF THE CASE

The defendant, Bobby Wallace, was charged by bill of information on May 12, 1992 with four counts of armed robbery, violations of La. R.S. 14:64. The defendant pleaded not guilty at his May 14, 1992 arraignment. The trial court denied the defendant’s motion to suppress the identi *290 fication on July 17, 1992. On August 20, 1992, this court granted the defendant’s writ application for the sole purpose of transferring it to the trial court for consideration before trial.[1] The State nolle pro-sequied Count Two of the bill of information on October 28, 1992. On October 29, 1992, a jury found defendant not guilty as to Count Three, and a mistrial was ordered as to Counts One and Four after the jury was unable to reach a verdict.
The defendant was retried on April 26, 1993, and a twelve-person jury found him guilty as charged as to Counts One and Four. On May 3, 1993, the defendant was sentenced on each count to serve twenty-five years at hard labor without benefit of parole, probation or suspension of sentence, with the counts to run concurrently. On November 9, 1993, the defendant was adjudicated a third-felony habitual offender. The trial court vacated the original sentence imposed on Count One and re-sentenced the defendant to sixty-six years at hard labor without benefit of parole, probation or suspension of sentence, to run concurrently with the sentence imposed in Count Four. The trial court denied the defendant’s motion to reconsider sentence.
On March 29, 1994, this court affirmed the defendant’s conviction and sentence in an errors patent appeal.[2] On February 26, 1998, this court denied the defendant’s writ application as to the denial of his application for post conviction relief.[3] On September 25, 1998, the Louisiana Supreme Court granted the defendant’s writ application in part, remanding it to the trial court with an order to grant the defendant an out-of-time appeal.[4] On August 23, 2001, the trial court granted the defendant an out-of-time appeal.

FACTS

James A. Ghio testified that on December 17, 1991, two men ran up to him while he was inserting a key into the trunk of a car while in front of his Algiers Point apartment at 323 Morgan Street. One of the men, later identified as the defendant, put a gun to Mr. Ghio’s head, frisked him, and robbed him of his money and wallet. The second person ran around to the driver’s door where the defendant’s fiancée, Jennifer Rader, was exiting. After robbing Mr. Ghio, the defendant pulled Ms. Rader’s mother, Marie Harper, out of the front passenger seat of the car. Mr. Ghio noticed when the defendant was frisking him that he and the defendant were very close in height. He also noted that the second robber was shorter than the defendant. One of the two men told Mr. Ghio to walk to the corner. When he got there one of the men told him to run. As he ran he heard one robber tell the other to shoot him. Mr. Ghio ran to a neighbor’s home where he called 911. He heard a gunshot while on the telephone with the 911 operator.
Jennifer Rader testified that the second perpetrator robbed her, not the one who robbed Mr. Ghio. She never had an opportunity to get a good look at the person who robbed Mr. Ghio. Ms. Rader corroborated Mr. Ghio’s testimony in a number of ways. She said the lighting conditions were very good — that there were lights in front of their building and street lights on other buildings. She said the robbery occurred just as it was getting dark. Ms. Rader also testified that one of the robbers told *291 the other to shoot Mr. Ghio. The person who robbed Ms. Rader of her purse and contents told her and her mother to walk away, and both robbers fled in the opposite direction. Ms. Rader followed until she heard a gunshot, whereupon she turned around and returned to the scene. She said her mother wore glasses, but had them in her purse at the time of the robbery. She identified someone in a photo lineup. She also went to a physical lineup, a different one than attended by Mr. Ghio, but was not able to identify anyone.
New Orleans Police Officer Gerald Burgess responded to two armed robbery complaints on December 17, 1991, one at 323 Morgan Street, the other one block away on a parallel street, Delaronde. The victim of the Delaronde Street robbery reported that one robber had a white bandanna on his head, just as in the Morgan Street robbery of Mr. Ghio and Ms. Rader. A shot was fired in connection with the Delaronde Street robbery, and the robber fled in a truck. A neighbor got the license plate number of the truck. Officer Burgess recorded the lighting conditions in both robberies as poor. However, it was his opinion that the streetlights provided adequate lighting. He recorded the description, in both cases, of the robber with the white bandanna as light-skinned, about five feet six inches tall, one hundred forty pounds, with a thin build, and the second robber as light-skinned, five feet eleven inches tall, one-hundred eighty pounds, with a heavy build. The victims on Morgan Street, Mr. Ghio, Ms. Rader and her mother, were quite upset but handled it well.
It was stipulated that if Officer Larry Nettles were called as a witness he would testify that he lifted a fingerprint from the car of Ms. Rader. New Orleans Police Officer Lawrence E. James testified that he compared this latent fingerprint to defendant’s fingerprints, but was unable to make a positive identification. Nor was he able to match them to “Johnny Green,” or to Ms. Rader. Officer James explained that the latent print lifted from Ms. Rad-er’s car was only a partial print, and that this prevented him from being able to make a match based on the necessary ten points of identification. However, he conceded that it was possible he could have matched it to someone else’s fingerprints.
New Orleans Police Officer Steven An-dry testified that on March 23, 1992, he and his partner arrested the defendant on an outstanding warrant. They received information that the defendant was in a particular vehicle at the corner of Newton Street and Whitney Avenue in Algiers. They observed the vehicle at that location, and requested assistance from other officers. Before those other officers arrived, the vehicle drove off. Officer Andry and his partner attempted to pull the vehicle over by activating their blue lights and siren, at which point the vehicle took off. After a twenty-minute high-speed chase into Gretna, the vehicle ran into a ditch. The defendant fled on foot, jumping over several fences, but was apprehended within one or two blocks.
Pansy Dixon testified that at dusk on December 17, 1991 she heard a woman who lived on Delaronde Street around the corner from her screaming that she had been robbed. Ms. Dixon ran to the corner and observed a thin male with his head covered by something light in color, carrying a shopping bag, run and enter a truck. She observed a second male standing outside of the truck. She ran up to the truck and got the license plate number before it drove off. Ms. Dixon testified that Delar-onde Street was lit up, that it had three streetlights in each block.
*292 Carmen Bourg testified that she was robbed on December 17, 1991 in the 300 block of Delaronde Street after driving home from work. She was face to face with the robber, a thin black male with white kerchief covering his hair and his hairline, carrying a silver revolver. She later identified the defendant’s photograph in a lineup shown to her in early February. She also identified the defendant in a subsequent physical lineup, and identified him in court. She was one hundred percent certain of her identification.
New Orleans Police Officer James Stein-kamp Jr. testified that Ms.- Rader identified Johnny Green in a photographic lineup he presented to her on December 18, 1991 as the person who robbed her. ' He subsequently developed the defendant as a suspect. Ms. Bourg identified the defendant in a photographic lineup he presented to her on February 5, 1992 as the person who robbed her. Officer Steinkamp conducted a' physical lineup on March 31, 1992, where both Mr. Ghio and Ms. Bourg identified the defendant. Ms. Rader was at this lineup, but was unable to identify anyone.
Officer Steinkamp testified on cross examination that he showed two other photo lineups to Ms. Bourg in which she did riot identify anyone, but later said that neither of those two lineups contained the defendant’s photo. Officer Steinkamp said he had not been called to testify in a case against Johnny Green, who apparently was arrested in connection with the robberies, but did not know whether Green had pleaded guilty.. .Officer Steinkamp conceded that the six-photo lineup he first showed Ms. Bourg depicted the defendant as noticeably having the highest or longest hair. : .

ERRORS PATENT

A review of the record reveals no errors patent.

ASSIGNMENT OF ERROR NO. 4

In this assignment of error, the defendant argues that the evidence was insufficient to convict him.[5] The defendant was convicted of robbing Mr. Ghio and Ms. Bourg at gunpoint. His -argument as to the sufficiency of the evidence is limited to the issue of identity.
This court set out the well-settled standard for reviewing convictions for sufficiency of the evidence in State v. Ragas, 98-0011 (La.App. 4 Cir. 7/28/99), 744 So.2d 99, as follows:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to -the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4 Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court must consider the record as a whole since that’ is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rar tional trier’s view of all the evidence most favorable to the, prosecution must *293 be adopted. The fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall; Green; supra. “[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.” State v. Smith, 600 So.2d 1319 (La.1992) at 1324.
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, supra, but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
98-0011, at p. 13-14, 744 So.2d at 106-107, quoting State v. Egana, 97-0318, p. 5-6 (La.App. 4 Cir. 12/3/97), 703 So.2d 223, 227-228.
In the instant case, the defendant first attacks his identification by Mr. Ghio, as to Count One. Mr. Ghio testified that the last thing he wanted to do was identify someone if he was uncertain. He went on to say that he was one hundred percent certain defendant robbed him. The evidence established that the robber was very close to Mr. Ghio — the robber put a gun to his head and frisked him. Mr. Ghio looked the defendant in the face as he was being robbed, and then watched the defendant accost Ms. Harper, pulling her out of the front passenger seat of the ear. He said the robbery occurred at dusk, approximately 6:00 p.m., and that the location was well lit by lights from his apartment building and condominiums across the street. Ms. Rader confirmed these lighting conditions. While the defendant points out that Officer Burgess recorded the lighting conditions in both robberies as poor, the officer also said he believed the streetlights provided adequate lighting, obviously meaning adequate for the victims to view the robbers.
Mr. Ghio said that he could not take his eyes off the defendant while viewing a physical lineup, and that when the defendant spoke it was clearer that he was the robber. Mr. Ghio said it was like being “revisited.” He conceded that the lighting at the lineup was different from that of the night of the robbery. He admitted that he could not recall enough specific details about the robber’s appearance to describe specific physical characteristics for police, other than that the robber was approximately the same height as himself. Mr. Ghio recalled that the defendant was armed with a silver gun, what he believed was a revolver, and that the defendant’s head was covered with a white handkerchief. Ms. Bourg, who also identified the defendant as the person who robbed her moments later around the corner, also testified that the robber was armed with a silver revolver and had a white bandanna on his head. Ms. Rader said the person who robbed Mr. Ghio had a silver or nickel gun.
The defendant notes that it came out at trial that the same person who robbed Mr. Ghio also robbed Ms. Harper. The testimony indicated that the defendant had been acquitted of robbing Ms. Harper, which was in fact true. However, Mr. *294 Ghio said that Ms. Harper was very old, could not see well, and was going to have an operation for cataracts. Ms. Rader said her mother, Ms. Harper, wore glasses but did not have them on at the time of the robbery.
The defendant points out that Mr. Ghio could not identify anyone in á photographic lineup presented to him by police a couple of days after the robbery. However, the defendant’s photo was not in that group of photos; Officer Steinkamp testified that Mr. Ghio was shown a photo lineup containing the photograph of another suspect.
The defendant next attacks his identification by Carmen Bourg, as to Count Four. Ms. Bourg was robbed one block away from Mr. Ghio’s robbery. She was face to face with the robber — he grabbed the purse from her shoulder and the packages she had in her left hand. She described him as a thin black male with white kerchief covering his hair and his hairline, carrying a silver revolver. Pansy Dixon, who lived near Ms. Bourg and came out upon hearing her scream that she had been robbed, testified that Ms. Bourg’s street was lit up — it had three streetlights in each block. The defendant mistakenly states in - his brief that Ms. Bourg did not identify the defendant in a photo lineup. Ms. Bourg identified the defendant’s photograph in a lineup shown to her by Office Steinkamp on February 5, 1992. She did not identify the defendant in the other two photo lineups she was shown, for the very good reason that those other two lineups did not contain photos of the defendant. Ms. Bourg also identified the defendant in a March 31, 1992 physical lineup, and identified him in court. She was one hundred percent certain of her identification.
In his argument in this assignment of error, the defendant argues that one reason the evidence was insufficient to sustain his conviction is because some of it was tainted. The defendant suggests that the physical lineup involved collusion between Mr. Ghio, Ms. Bourg, Ms. Rader and/or police, noting that all three witnesses viewed the physical lineup together. • However, Officer Steinkamp | ^testified that the witnesses sat apart from each other at the lineup, and that each was asked to indicate on a piece of paper whether they could identify someone in the lineup.
The defendant argues that medical records obtained in February 1999 — almost six years after his trial — reflect that in June 1990 defendant was suffering from a seizure disorder and blackouts as a result of having sustained a gunshot wound to his head. He claims the records reflect that he was provided a brace for his right foot due to paralysis from the gunshot wound. The defendant suggests that these facts call into question the sufficiency of the evidence, as in both robberies the victim testified that the robber ran. The defendant submits that the “willingness to go to trial without the medical records in hand despite there being subpoenaed was serious error.” There is no merit to this part of the defendant’s argument insofar as this appeal is concerned. There is no indication that any action by the trial court or the State prevented the defendant from presenting evidence of any physical disability. If defendant discovered new and material evidence that could not have been discovered through reasonable diligence before his trial, he should have filed a motion for a new trial. The defendant raises no claim that his counsel was ineffective in failing to obtain and present any such evidence.
The defendant suggests that the evidence is insufficient to support his convictions because those convictions essentially rest on his identification by the victims in each case, Mr. Ghio and Ms. Bourg. *295 In a case where there is no physical evidence to link a defendant to the crime charged, the testimony of one witness, if believed by the trier of fact, is sufficient support for a factual conclusion required for a verdict of guilty. State v. Marcantel, 00-1629, p. 9 (La.4/3/02), 815 So.2d 50, 56.
Viewing all of the evidence in a light most favorable to the prosecution, any rational trier of fact could have found all of the essential elements of the crimes charged present beyond a reasonable doubt.
There is no merit to this assignment of error.

ASSIGNMENTS OF ERROR NOS. 1&3

In Assignment of Error No. 1, the defendant claims he was prejudiced by the State’s reference to hearsay in its opening statement. For the same reason, in Assignment of Error No. 3, the defendant claims the trial court erred in denying his motion for mistrial.
In arguing his Assignment of Error No. 3, the defendant claims that the State introduced evidence of other crimes committed by him because, although the armed robbery charge as to Ms. Rader had been nolle prosequied by the State, she referred in her trial to testimony to acts by two robbers. There was no defense objection at any point during Ms. Rader’s testimony, much less a motion for mistrial based on her testimony. There is no merit to this part of the defendant’s Assignment of Error No. 3.
In his opening statement, the prosecutor referred to statements by Larry Hebert, who testified at the first trial, but did not testify at the second trial, that is the subject of this appeal. The prosecutor also referred to statements by the mother of Johnny Green, a juvenile apparently arrested as the second robber, and to statements by an unnamed police officer, presumably Det. Steinkamp, who investigated the robberies. The prosecutor said:
Now, Larry Hebert, just so happened the night before, December 16th, he was over at a friend’s house watching the football game on TV. And someone at the house |12asked to borrow his truck. Now, it wasn’t someone he knew that well. But the friend he was with, watching the game, the friend’s house he was at, said, “I’ve known him for a long time. He’s a good guy. You can trust him.”
So Larry let his truck be used. He thought the guy was just going to run to the store or something, and be back in a minute. But the guy never came back. And Larry was concerned because it wasn’t someone he knew. So he waited and the game was over, and the truck still wasn’t back. But the friend said, “Don’t worry he’ll bring your truck back. He got tied up or something.” So Larry went ahead and walked home.
Next morning when he woke up, the truck still wasn’t there, still gone. Larry Hebert still didn’t know where his truck was until the police came out and made a visit to his house. The police told him, ‘Tour truck was used in an armed robbery. One of the people involved got the license plate number, took it down. Now, where were you on the night of December 17th?”
That’s when Larry Hebert explained to the police that he had lent his truck. Now, he didn’t know the identity of that person. But he said, “Well, the guy I was with, the guy whose house I was at watching the game with, he knows who that is. Go ask him.”
So the police went to that individual. That’s where they got the name Johnny Green. Eventually, Johnny Green, who was a juvenile, was arrested in connection with this armed robbery.
*296 That’s when the police got their break that led them to Bobby Wallace. Detective Steinkamp, who is a robbery detective, received a phone call from Johnny Green’s mother. Johnny Green’s mother told Detective Steinkamp, “Wasn’t Johnny Green that did that. Sure, he borrowed the truck, but he lent it to Bobby Wallace.”
So with that information, the police officer, .Detective Steinkamp, generated what’s called a “photograph lineup.” If you’ve sat on a jury before you may be acquainted with it. It’s a series of photographs for—
Defense counsel interrupted at that point and asked for a bench conference, which was not recorded. When the opening statements concluded, the trial judge admonished the jury:
Ladies and gentlemen, I caution you, and I think one of the attorneys, said this, but just to give it my imprimatur, none of these statements that you’ve heard from the attorneys, as they’ve just spoken to you, is, in fact, evidence in this case. And the only evidence that you are to consider and to weigh is what you hear from this witness stand. Okay?
During a break in the trial, after three of the state’s eight witnesses testified, out of the presence of the jury, defense counsel moved for a mistrial on the ground that the prosecutor referred to hearsay in his opening statement. The trial court chastised the State, but denied the motion for mistrial, stating that it would give an admonishment in its charge to the jury. The record reflects that prior to closing arguments the trial court admonished the jury as follows:
I just caution you, that this is the time for the attorneys to remind you of the testimony that’s gone by, to interpret that for you, obviously in the best light that favors their position. The only caution I’m going to give you is this: What the attorneys say is not evidence. If the attorneys say something about testimony that was given and that does not square with your account of what you heard, your account is what governs, not what the attorneys say. Okay?
In addition, approximately one-half hour into deliberations the jury returned to the courtroom when a juror had a question concerning her/his realization that she/he recognized some names mentioned by witnesses who testified at trial. The trial court admonished the jury:
The only evidence that anybody can act on is the evidence that you heard from this [witness] chair.
And again, the trial judge in referring to testimony from the witness stand stated:
It does not exist unless you hear it from here.
This was followed by yet another admonition by the trial judge that the jury to limit their deliberations to what they heard from the witness stand:
You cannot make things up. You cannot guess at things. Now, what you must act on, all of you must act on, is what you hear here [the witness chair]. [Emphasis added.]
While these last three admonitory statements were initiated in response the problem of a juror recognizing names mentioned during the trial testimony, and not to the prosecutor’s reference to damaging statements of persons who did not testify at trial, or who did not testify to the substance of the statements made by the prosecutor, they were directed to the jury as a whole and not just to the juror who ask the question. Moreover, the admonitions were clearly intended to be general and universal in application and were not limited to a narrow admonition to disre *297 gard the one item of concern brought up by the juror asking the question.
Accordingly, to the extent that the improper statements made by the prosecutor in his opening statement can be cured by admonitions from the bench, we find that the admonitions given by the trial judge were sufficient and all that could be expected.
Hearsay is a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted. La. C.E. art. 801(C); State v. Castleberry, 98-1388, p. 18 (La.4/13/99), 758 So.2d 749; State v. Raby, 98-1453, p. 8-9 (La.App. 4 Cir. 6/2/99), 738 So.2d 699, 703. Hearsay is not admissible except as otherwise provided by the Code of Evidence or other legislation. La. C.E. art. 802; State v. Richardson, 97-1995, p. 13 (La.App. 4 Cir. 3/3/99), 729 So.2d 114, 121.
The prosecutor clearly referred to statements by several persons in his opening statement, including Larry Hebert, Johnny Green’s mother, and a police officer, presumably Det. Steinkamp, who the prosecutor said told Larry Hebert a witness got the license number of his truck that was used in a robbery. La.C.Cr.P. art. 766 states that the opening statement of the State shall explain the nature of the charge and set forth, in general terms, the nature of the evidence by which the State expects to prove the charge. A prosecutor’s opening statement is not evidence and has no probative force. State v. Gray, 542 So.2d 684, 686 (La.App. 4 Cir.1989).
In State v. Gray, supra, the defendant complained that the prosecutor impermissibly referred to inadmissible hearsay by telling the jury in his opening statement that a police officer would testify that he received a telephone call from an informant, who told the officer to come to her home if he wanted cocaine. This Court found no reversible error, explaining that:
Although a prosecutor may not refer to inadmissible hearsay, in the absence of prosecutorial bad faith and substantial prejudice to the defendant, the error is not reversible. State v. Scott, 454 So.2d 851 (La.App. 5th Cir.1984).
Id. This Court then went on to explain why it found no reversible error:
In this case, as in Scott, supra, there is sufficient evidence to connect the defendant with the crime independent of the reference in the district attorney’s opening statement. The transaction was in fact complete in this case and the jury could have connected the defendant with the crime without the introduction of Giraud’s statement. Moreover, “the prosecutor’s opening statement is not evidence and has no probative force.” Rather, it is designed to inform the jury that they may understand the evidence as it unfolds and to protect the defendant from surprise: [State v.] Green, [343 So.2d 149, 151 (La.1977)]. Here there is no evidence of prosecutorial bad faith or substantial prejudice to the defendant.
State v. Scott, 454 So.2d 851 (La.App. 5 Cir.1984), presented circumstances similar to those in the instant case. In Scott, the defendant complained that the prosecutor said in his opening statement that a police officer would testify that he used a license plate number to determine that the getaway vehicle in an armed robbery belonged to the defendant. The license plate number was never introduced in evidence. In finding no reversible error the Scott court explained that:
Article 766 of the Louisiana Code of Criminal Procedure states that the State’s opening statement shall explain *298 the nature of the charge and set forth, in general terms, the nature of the evidence by which the State expects to prove the charge. In State v. Green, 343 So.2d 149, 151 (La.1977), the court stated:
The general rule is that, absent bad faith on the part of the prosecutor or clear and substantial prejudice, the reference in the opening statement to evidence later ruled inadmissible is not a ground for a mistrial. The rule takes into account that proof frequently falls short of professional expectations. [Emphasis added.]
Additionally, the court in Clark v. Blackburn, 605 F.2d 163, 165 (5th Cir.1979), citing Green, supra,. held that under Louisiana law, failure to prove a part of the prosecution’s opening statement does not constitute grounds for reversal. The defendant has not alleged or proven bad faith on the part of the prosecution, and we find there is no clear and substantial prejudice to the defendant resulting from the district attorney’s opening statements ... [T]here is sufficient evidence to connect the defendant with the crime for which he is charged independent of any inference in the district attorney’s opening statement.
Scott, supra, at 853-854. In the instant case, just as in Scott, “[t]he defendant has not alleged or proven bad faith on the part of the prosecution.” Moreover, also as in Scott, in the instant case “there is sufficient evidence to connect the defendant with the crime for which he is charged independent of any inference in the district attorney’s opening statement.”
Similarly in State v. Clark, 499 So.2d 332, 337 (La.App. 4 Cir.1986), this Court found no reversible error in an improper reference by the prosecution in closing argument tying the defendant to a “getaway van” via a license plate:
Williams further argues that the trial judge committed reversible error in failing to declare a mistrial after the prosecution “deliberately attempted to poison the trial” by stating in closing argument that the getaway van with a Wisconsin license plate belonged to defendant Williams.
Even assuming that the prosecutor improperly commented on inadmissible evidence by alluding to Williams’s Wisconsin residency, there are no grounds for reversal. Before improper argument can be considered as prejudicial, the court must be convinced that the objectionable reference influenced the jury and contributed to the guilty verdict. State v. Jarman, 445 So.2d 1184 (La.1984); State v. Sharp, 418 So.2d 1344 (La.1982).
In the instant ease, the brief references linking Williams to the van with the Wisconsin license plate could not reasonably have contributed to the guilty verdict where the jury heard the strong identification testimony of three eyewitnesses. Under these circumstances, we find no reversible error.
Id. We note that in Clark this Court apparently relied entirely on harmless error analysis, there being no mention in the opinion of any corrective instructions by the trial judge in stark contrast to the corrective instructions given by the trial judge in the instant case. In Clark the court found no reversible error where the “jury heard strong identification testimony,” similar to the strong identification testimony, heard by the jury in the instant case. Both victims were absolutely certain of their identification of defendant, and defendant has not shown that the identifications were suggestive or unreliable. The testimony of a single witness, if credi *299 ble, may establish the elements of a crime beyond a reasonable doubt. State v. Boudreaux, 00-0073, pp. 6-7 (La.App. 4 Cir. 12/20/00), 777 So.2d 596, 599.
Moreover, regarding other inadmissible hearsay evidence in Clark this Court noted that:
Furthermore, inadmissible hearsay is considered harmless if it is cumulative or corroborative of in-trial testimony. State v. Spell, 399 So.2d 551 (La.1981); State v. McIntyre, 381 So.2d 408 (La.1980), certiorari denied McIntyre v. Louisiana, 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 90 (1980). Even if the officer’s testimony were hearsay, it largely corroborated the testimony of the three victims present at trial.
Id. If hearsay testimony is improperly admitted into evidence, it may be considered harmless error if the reviewing court determines that it did not contribute to the verdict. State v. Hearold, 603 So.2d 731, 739 (La.1992); State v. Brown, 02-1217 (La.App. 4 Cir. 5/28/03), 853 So.2d 8.
The court in Scott, supra, cited and relied upon State v. Green, 343 So.2d 149 (La.1977), where the State informed the jury in its opening statement in a negligent homicide prosecution that the defendant’s blood alcohol concentration was .30. The trial court subsequently disallowed the blood test results because the consent form did not reflect that the defendant had been advised of his rights. The trial court denied the defendant’s motion for mistrial. On appeal, the court cited the rule that the reference in an opening statement to evidence later ruled inadmissible is not a ground for mistrial absent bad faith or clear and substantial prejudice.
Unlike in the instant case, the trial court in Green specifically found that the State acted in good faith. The Louisiana Supreme Court found nothing to contradict this good faith finding by the trial court. The references to the question of good faith by the trial court and the Supreme Court suggest that there may have been allegations by the defense of prosecutorial bad faith in Green that are lacking in the instant case just as they were lacking in Scott.
In State v. Shaffer, 260 La. 605, 257 So.2d 121 (1971), where four defendants were tried and convicted of aggravated rape, the State said in its opening statement that it would show that the medical findings in the case were compatible with rape and recent sexual intercourse. After the State rested its case, the defendants moved for a mistrial on the ground that they were prejudiced because no evidence had been offered as to those medical findings. The Supreme Court stated that an opening statement has no probative force. It also said that the failure to produce the medical evidence raised only a question of sufficiency of the proof, which was not a ground for a mistrial, citing La.C.Cr.P. art. 775.
The Supreme Court in Green concluded its analysis by relying heavily on Shaffer, supra:
We regard the case of State v. Shaffer, supra, as controlling here. [Emphasis added.] In that case, the district attorney, in his opening statement, said: ‘The State will show the medical findings in this case are compatible with rape and recent sexual intercourse.’ When the State had rested, defendants moved for a mistrial on the ground that the State had failed to produce the medical evidence. We held:
‘The opening statement has no probative force. State v. Kreller, 255 La. 982, 233 So.2d 906 [(1970)]. It is designed to inform and protect from surprise. The failure to produce the medical evidence raises only a ques *300 tion of sufficiency of the proof and is no ground for a mistrial. See C.Cr.P. Art. 755.’
We conclude that the trial judge properly overruled the motion for a mistrial and that these assignments of error are without merit.
Green, supra, at 152.
The defendant in his brief argues that the “hearsay” testimony by the prosecutor in his opening statement was prejudicial to the defendant based on the following analysis of Ms. Pansy Dixon’s testimony:
Ms. Dixon did not observe the robbery but saw an individual approximately one-half block away running with a shopping bag and getting into a vehicle that had been parked on Laverne Street. She did not see the individual’s face and would not be able to recognize him. She made the assumption [emphasis original] that the vehicle may [emphasis original] have been involved in the robbery. (Tr. P. 74-5). The following analysis emerges. Ms. Bourg, the victim, saw the defendant run away. She did not see him get into a vehicle. Ms. Dixon heard screaming in the distance about a robbery and assumed the person carrying the shopping bag was the same person that had stolen a purse (which she did not see) and a package from the arms of Ms. Bourg. Thus, Ms. Dixon did not see a purse or a package but saw only a shopping bag and a person get into a vehicle. This is tenuous at best. The only connection between the defendant here and the vehicle was the clear hearsay, double hearsay and triple hearsay statements of the district attorney and Detective Steinkamp. Absent these hearsay statements, there is absolutely no connection between Bobby Wallace and the vehicle.
This argument by the defendant creates the impression that there was nothing in Ms. Dixon’s testimony pointing to the defendant other than the reference to the truck which could only be connected to the defendant by way of the prosecutor’s improper remarks in his opening statement. However, in addition |g1to remarking on what was to her obviously a suspicious character running to the truck at virtually the same time as and only a short distance from the occurrence of the robbery, in spite of the fact that she could not identify the man she saw running to the truck, when asked by defense counsel on cross-examination if she could recall the color of what was covering his head she responded: “A light color, white, light or white.” She also recalled that he was thin.
This is consistent with the testimony of the victim, Ms. Carmen Bourg who testified that her assailant had “a white turban, a kerchief on his head,” and that he was thin.
Under La.C.Cr.P. art. 775, a mistrial shall be ordered when prejudicial conduct in the courtroom makes it impossible for- the defendant to obtain a fair trial. “Mistrial is an extreme remedy and, except for instances -in which the mandatory mistrial provisions of La.C.Cr.P. art. 770 are applicable, should only be used when substantial prejudice to the defendant is shown.” State v. Castleberry, 98-1388, p. 22 (La.4/13/99), 758 So.2d 749, 768. “The determination of whether actual prejudice has occurred, and thus whether a mistrial is warranted, lies within the sound discretion of the trial judge, and this decision will not be overturned on appeal absent an abuse of that discretion.” State v. Wessinger, 98-1234, p. 24 (La.5/28/99), 736 So.2d 162, 183. We find no abuse of that discretion based on the particular facts of hits case.
State v. Pardon, 97-248, p. 12 (La.App. 5 Cir. 10/15/97), 703 So.2d 50, 61 reaches the same conclusion:
*301 In closing argument, the prosecutor stated that Richard Betts heard Virginia Keener say, “You [the defendant] did not have to Mil him.” The trial court sustained defense counsel’s hearsay objection at that time.
If the Court finds that the prosecutor improperly referred to the Statement in closing argument, the defendant must still show substantial prejudice in order to have her conviction reversed. State v. Perkins, 94-366 (La.App. 5 Cir. 2/15/95); 652 So.2d 21, 26. Although the trial court denied the defendant’s motion for a mistrial, the court fully admonished the jury, and no prejudice resulted from any improper reference. [Emphasis added.]
The question of prejudice is the same as the question of harmless error. In this case it can be said that there was no prejudice to the defendant, i.e., the error was harmless, because it can be said that the guilty verdict rendered in this case was surely unattributable to the error. See State v. Snyder, 98-1078, p. 15 (La.4/14/99), 750 So.2d 832, 845 (to determine whether an error is harmless, the proper question is whether the guilty verdict actually rendered in the trial was surely unattributable to the error).

ASSIGNMENT OF ERROR NO. 2

In this assignment of error, the defendant argues that he was denied what he maintains was his constitutional right to assistance of counsel at the physical lineup.
In 1993, State v. Hattaway, 621 So.2d 796 (La.1993), the Louisiana Supreme Court held that the right to counsel under La. Const. Art. I, § 13 attaches no later than the point when the State’s role shifts from investigation to accusation, with the initiation of adverse judicial criminal proceedings — no later than the initial court appearance or first judicial hearing. Id. at 814. In State v. Carter, 94-2859 (La.11/27/95), 664 So.2d 367, the Louisiana Supreme Court reiterated that holding in Hattaway, while recognizing that the right to counsel under La. Const. I, § 13 and the Sixth Amendment to the U.S. Constitution are coextensive in scope, operation and application, insofar when the right attaches, the proceedings at which it applies, and whether it can be waived. 94-2859, p. 20, 664 So.2d at 382.
In Stewart v. State of Louisiana, 95-2385 (La.7/2/96), 676 So.2d 87, the court held that its holding in Hattaway as to when the right to counsel attaches did not apply retroactively to a physical identification lineup conducted without benefit of counsel after the defendant’s first court appearance and appointment of counsel, but prior to indictment. The court said that the defendant in Stewart had a right to prove unfairness depriving him of due process, but that he had tried and failed to do so.
The defendant had no constitutionally guaranteed right to the assistance of counsel at the March 31, 1992 physical lineup because it was held prior to his May 12, 1992 indictment. This is true even assuming defendant made an initial appearance and was appointed counsel between his March 23, 1992 arrest and that lineup. Although defendant claims he was denied due process, he bases that on the simple fact that he did not have the assistance of counsel, and suggests that the physical identification procedure was tainted because Mr. Ghio, Ms. Bourg and Ms. Rader were all placed in the same room for the viewing. However, as previously noted, Det. Steinkamp said he placed them apart from each other, and directed them to indicate on a piece of paper whether they could identify anyone. There is no evidence that the physical identification procedure was tainted.
There is no merit to this argument.

*302
ASSIGNMENT OF ERROR NO. 5

In the title of this assignment of error, the defendant asserts that he suffered “violations of equal protection and due process, when the court permitted the jury to continue to deliberate after a juror expressed doubts as to his/her ability to deliberate in the case.” The defendant refers to a point approximately one-half hour into deliberations, when the jury was returned to the courtroom. An unidentified juror informed the court that she felt it would not be fair for her to serve on the jury because of some names she recognized during the trial testimony. The trial court advised the juror that the jury’s decision had to be based on the evidence, that no one could volunteer outside information, and that any such information did not exist unless the jury heard it from the witness chair. The trial court concluded by asking the juror if she/he felt that everything was all right, and the juror responded in the affirmative.
At no point did the defendant object to the juror continuing to deliberate. A defendant cannot avail himself of an alleged error unless he made a contemporaneous objection at the time of the error. La. C.Cr.P. art. 841(A); State v. Seals, 95-0305, p. 5 (La.11/25/96), 684 So.2d 368, 373; State v. Spain, 99-1956, p. 11 (La.App. 4 Cir. 3/15/00), 757 So.2d 879, 886. Accordingly, the defendant is precluded from raising any claim of error here.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 6

In this assignment of error, the defendant claims that the trial court erred in adjudicating defendant a third-felony habitual offender, because the documentation submitted as to a probation revocation for one of defendant’s prior convictions did not show that the defendant was advised of his right to a hearing or his right to remain silent, two of his Boykin rights[6], before he admitted to the allegations in the rule to revoke. Defendant claims this is an error patent, implicitly conceding that no objection was made as to this issue. The defendant cites no authority that the alleged error is an error patent. To the contrary, a defendant may not complain for the first time on appeal of the failure to prove compliance with Boykin relative to prior convictions used in a habitual offender proceeding. State v. Boles, 99-0427, p. 7 (La.App. 4 Cir. 5/10/00), 763 So.2d 74, 79.
The defendant’s failure to object precludes review of this assignment of error.

ASSIGNMENT OF ERROR NO. 7

In this last assignment of error, the defendant complains that the sixty-six year sentence imposed on him as a third-felony habitual offender on one of his armed robbery convictions is unconstitutionally excessive. The defendant complains that no pre-sentence investigation was ordered, and the trial court imposed the sentence without articulating any significant reasons for imposition of what he characterizes as a severe sentence.
The defendant was sentenced as a third-felony habitual offender pursuant to La. R.S. 15:529.1(A)(i)(b), which provides that for a person convicted of an offense punishable by imprisonment for any term less than his natural life, the offender shall be sentenced to imprisonment for a determinate term not less than two-thirds of the longest possible sentence for the conviction and not more than twice the longest possible sentence prescribed for a first conviction. The defendant was sentenced on one of his two armed robbery convictions. La. R.S. 14:64 states that a person convict *303 ed of armed robbery shall be imprisoned at hard labor for not less than ten years and for not more than ninety-nine years, without benefit of parole, probation or suspension of sentence. Thus, the defendant’s sentence of sixty-six years was the minimum statutory sentence the trial court could have imposed.
Even though a sentence under the Habitual Offender Law is the minimum provided by that statute, the sentence may still be unconstitutionally excessive if it makes no measurable contribution to acceptable goals of punishment, or is nothing more than the purposeful imposition of pain and suffering, and is grossly out of proportion to the severity of the crime. State v. Johnson, 97-1906, p. 6-7 (La.3/4/98), 709 So.2d 672, 677; State v. Dorthey, 623 So.2d 1276, 1280-81 (La.1993). However, the entire Habitual Offender Law has been held constitutional and, thus, the minimum sentences it imposes upon habitual offenders are also presumed to be constitutional. Johnson, 97-1906 at p. 5-6, 709 So.2d at 675; see also State v. Young, 94-1636, p. 5 (La.App. 4 Cir. 10/26/95), 663 So.2d 525, 527. There must be substantial evidence to rebut the presumption of constitutionality. State v. Francis, 96-2389, p. 7 (La.App. 4 Cir. 4/15/98), 715 So.2d 457, 461. To rebut the presumption that the mandatory minimum sentence is constitutional, the defendant must show by clear and convincing evidence that he is exceptional, which in this context means that because of unusual circumstances he is a victim of the legislature’s failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case. State v. Lindsey, 99-3302, 99-3256, p. 5 (La.10/17/00), 770 So.2d 339, 343; Johnson, 97-1906 at p. 8, 709 So.2d at 677. “Departures downward from the minimum sentence under the Habitual Offender Law should occur only in rare situations.” Johnson, 97-1906 at p. 9, 709 So.2d at 677.
The defendant infers that the trial court did not consider the mitigating and aggravating factors of La.C.Cr.P. art. 894.1. However, in denying the defendant’s motion to reconsider sentence, the trial court stated that it had “taken its time to evaluate all the circumstances.” Moreover, in a case such as the instant one, where the mandatory minimum sentence is imposed, this court has held that it is an exercise in futility for the court to enumerate reasons for sentencing. State v. Green, 99-2847, p. 8 (La.App. 4 Cir. 11/29/00), 779 So.2d 885, 840.
The defendant simply argues that his sentence is clearly excessive under State v. Dorthey, supra. He sets forth no reasons why it is excessive, but merely questions the sufficiency of the evidence. The defendant’s sentence is presumed to be constitutional. He has failed to meet his burden under Lindsey, supra of rebutting that presumption, in that he has failed to show by clear and convincing evidence that he is exceptional.
There is no merit to this assignment of error.
For the foregoing reasons, the defendant’s conviction and sentence are affirmed.
CONVICTION AND SENTENCE AFFIRMED.

. State v. Wallace, unpub., 92-1852 (La.App. 4 Cir. 8/20/92).

. State v. Wallace, unpub., 93-1426 (La.App. 4 Cir. 3/29/94), 635 So.2d 1349.

. State v. Wallace, 97-1766, unpub., (La.App. 4 Cir. 2/26/98).

. State ex rel. Wallace v. State, 98-1037 (La.9/25/98), 726 So.2d 4.

. When issues are raised on appeal as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. State v. Hearold, 603 So.2d 731, 734 (La.1952); State v. Marcantel, 2000-1629, p. 8 (La.4/3/02), 815 So.2d 50, 55.

. Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969)