STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

06-1158

STATE OF LOUISIANA

VERSUS

WILLARD BRANDENBURG

**********

APPEAL FROM THE
THIRTY-FIRST JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON DAVIS, NO. CR-969-04
HONORABLE CHARLEY QUIENALTY, JUDGE AD HOC

**********

J. DAVID PAINTER
JUDGE

**********

Court composed of Marc T. Amy, J. David Painter, and James T. Genovese, Judges.

AFFIRMED.

Michael C. Cassidy, District Attorney
Bennett R. LaPoint, Assistant District Attorney
P.O. Box 1388
Jennings, LA 70546
Counsel for State of Louisiana

Mark O. Foster
Louisiana Appellate Project
P. O. Box 2057
Natchitoches, LA 71457-2057
Counsel for Defendant-Appellant:
    Willard Brandenburg

**PAINTER, Judge.**

Defendant, Willard Brandenburg, appeals his conviction and sentence on the charge of aggravated burglary. For the reasons that follow, we affirm the conviction and sentence.

## FACTUAL AND PROCEDURAL BACKGROUND

On the evening of July 4, 2004, Defendant went to the home of Jessie and Bonnie Davis in Elton, Louisiana. Toinette Fontenot, Defendant's long-time girlfriend, and their daughter lived at the Davis residence. Defendant had been to the house twice that day to visit his daughter because it was her birthday. A confrontation occurred between Ms. Fontenot and Defendant, resulting in the police being summoned. Defendant took his daughter for a visit, but later she called her mother and asked to be brought home. Later in the evening, during a heated phone discussion with Defendant, Ms. Fontenot told him that his daughter had gone to watch fireworks with friends and was not at the Davis residence. Defendant threatened to come over and kill everyone unless he could have his daughter. Mrs. Davis called the police and locked all the doors. Defendant came to the house, kicked in the front door, and found Ms. Fontenot hiding in the master bathroom with a shotgun. The couple fought over the gun, which discharged through a wall and into a closet where the daughter and two other children were hiding. Defendant took the shotgun away from Ms. Fontenot and beat her with the shotgun. Two more shots were discharged. Still in possession of the shotgun, Defendant chased Ms. Fontenot into the backyard. Outside the house, Mr. Davis confronted Defendant and shot him in the chest.

1

Defendant was charged by a Grand Jury Indictment with one count of attempted second degree murder, violations of La.R.S. 14:27 and 14:30.1; one count of aggravated battery, a violation of La.R.S. 14:34; one count of possession of a firearm by a convicted felon, a violation of La.R.S. 14:95.1; and one count of aggravated burglary, a violation of La.R.S. 14:60. However, the matter went to trial only on the aggravated burglary charge. Following a trial by jury, Defendant was convicted of aggravated burglary.

The court ordered a pre-sentence investigation and sentenced Defendant to serve thirty years at hard labor. The trial court subsequently vacated the sentence in response to Defendant's *pro se* motion for acquittal. Following a hearing, the trial court denied the motion and re-sentenced Defendant to serve thirty years at hard labor. Defendant's motion to reconsider the sentence was denied without written reasons.

Defendant now appeals his conviction and sentence. In brief, he asserts the following assignments of error:

1. The evidence was insufficient to support the conviction for aggravated burglary.

2. The trial court erred in allowing the 911 tapes into evidence over [Defendant's] hearsay objection.

3. The trial court erred in sustaining a hearsay objection as to the testimony of Rhonda Comeaux about statements made to her by Ms. Fontenot.

4. The trial court abused its discretion in refusing to consider [Defendant's] request to discharge his retained counsel and, [sic] represent himself at trial.

5. The trial court erred in denying [Defendant's] motions for mistrial based on [La.Code Crim.P.] art. 775.

6. [Defendant's] 30-year sentence was constitutionally excessive.

2

Defendant also filed a *pro-se* brief alleging additional assignments of error, as follows:

1. The trial court denied [Defendant] of the right to a fair trial by allowing the [j]ury to take a copy of unknown material into the jury room to read while deliberating on a verdict (La. Constitution Article 1 § 16, U.S.C. Constitution Amendments 5th, 6th, and 14th). [sic] and for giving improper instructions to the jury relative to charged offense not included within the responsive verdict.

2. The trial court denied [Defendant] the right of a fair trial by denying him a continuance on the morning of trial when the District Attorney amended the Grand Jury Indictment. (La. Constitution Article 1 § 16, U.S.C. Constitution Amendments 5th, 6th, and 14th).

3. [Defendant's] conviction and sentence is null and void based on the invalid Grand Jury Indictment 969-04 which is error patient [sic] on the face to the record. (La.C.Cr.P. Art. 920(2)[)].

4. The State's attempt to have the charges dismissed without prejudice for the later purposes of reinstituting offenses where institution for prosecution by trial had already expired deprives [Defendant] of the right to due process of law as guaranteed by the United States Constitution 14th Amendment.

We affirm Defendant's conviction and sentence for the following reasons.

**DISCUSSION**

**ASSIGNMENT OF ERROR NUMBER 1:**

For his first assignment of error, Defendant asserts that the evidence presented was insufficient to support his conviction for aggravated burglary. In support of this claim, Defendant argues that he did not enter the house with the intent to commit any felony. He further alleges "[t]he fact that Mr. Brandenburg took a shotgun from Ms. Fontenot, after entering the home, cannot be used to bootstrap the necessary specific intent to commit felony battery."

In determining sufficiency of the evidence on appeal, this court has previously stated:

3

When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witness. Therefore, the appellate court should not second-guess the credibility determination of the trier of fact beyond the sufficiency evaluations under the Jackson standard of review. *See King*, 436 So.2d 559, citing *State v. Richardson*, 425 So.2d 1228 (La.1983).

In order for the State to obtain a conviction, it must prove the elements of the crime beyond a reasonable doubt. In order for this court to affirm a conviction, the record must reflect that the State has satisfied this burden of proving the elements of the crime beyond a reasonable doubt. *State v. Kennerson*, 96-1518 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367.

*State v. Touchet*, 04-1027, pp. 1-2 (La.App. 3 Cir. 3/9/05), 897 So.2d 900, 902 (citing *State v. Lambert*, 97-64, pp. 4-5 (La.App. 3 Cir. 9/30/98), 720 So.2d 724, 726-27).

"The trier of fact makes credibility determinations and may, within the bounds of rationality, accept or reject the testimony; thus, a reviewing court may impinge on the 'fact finder's discretion only to the extent necessary to guarantee the fundamental due process of law.'" *State v. Johnson*, 03-1228, pp. 4-5 (La. 4/14/04), 870 So.2d 995, 998 (citing *State v. Sylvia,* 01-1406, p. 2 (La. 4/9/03), 845 So.2d 358, 361).

Defendant was charged as follows:

[Defendant] [d]id unlawfully commit aggravated burglary of the dwelling of Jesse Davis by entering the dwelling without authority, with the intent to commit a felony therein, and further, did arm himself with a dangerous weapon to with [sic]: a shotgun, after entering or committed a battery upon a person while in such place, or in entering or leaving such place (a felony) in violation of LSA R.S. 14:60.

4

Aggravated burglary is defined as:

[T]he unauthorized entering of any inhabited dwelling, or of any structure, water craft, or movable where a person is present, with the intent to commit a felony or any theft herein, if the offender,

> (1) Is armed with a dangerous weapon; or
>
> (2) After entering arms himself with a dangerous weapon; or
> (3) Commits a battery upon any person while in such place, or in entering or leaving such place.

La.R.S. 14:60.

A battery is defined as "the intentional use of force or violence upon the person of another." La.R.S. 14:33.

Ms. Fontenot testified she had been dating Defendant for several years and that they have a thirteen-year-old daughter together. She said that she and Defendant had a house together, but that house was damaged by a hurricane. After the home was damaged, Ms. Fontenot and her daughter moved into the Davis residence while Defendant continued to live in the home and work on its repairs.

Ms. Fontenot stated that her daughter's birthday was July 4th and that Defendant took them out for dinner at a casino on the night before her birthday. She stated that while she was in another part of the casino, Defendant told her daughter he was not feeling well and left. She said she had to call Mrs. Davis to pick her and her daughter up from the casino.

Defendant went to the Davis residence the next morning. Ms. Fontenot said that they had an argument that morning because she was still in bed when he arrived. He picked up the birthday cake she had bought for their daughter and threw it to the ground. Ms. Fontenot said that during the argument, they yelled at each other, and he pushed her down.

Later that morning, at approximately 11:30 a.m., Defendant returned and wanted to take his daughter back to his house for a visit. They argued again, but Ms. Fontenot testified that their daughter wanted to go with her father, so she allowed it. However, Ms. Fontenot stated that her daughter called her a few hours later and asked to be picked up because Defendant went to bed.

Later that evening, Ms. Fontenot received a message to call Defendant at a friend's house. She said that he did not have a phone. When she called, he told her that he wanted to take their daughter to light fireworks. Although their daughter was at the house, Ms. Fontenot told him that she was already out watching fireworks with other friends. The couple argued, and Defendant became angry and threatened to come to the house and kill everyone.

When she told Mr. and Mrs. Davis what Defendant said, Mrs. Davis called the police. Mr. Davis armed himself with a pistol. Mrs. Davis sent the girl and two other children into a closet in the master bedroom and handed Ms. Fontenot a loaded shotgun. When she heard Defendant pounding on the doors around the house, Ms. Fontenot hid in the bathroom of the master bedroom. She said that she then heard a crash, and Defendant searched the house until he found her in the bathroom. She testified that she fired the shotgun, but missed. The shot went through the bathroom wall into the closet where the children were hidden. She testified that there was a struggle for the shotgun, and two more shots were fired. She said that Defendant was striking and kicking her. She stated that Defendant chased her out of the house into the back yard while he was still in possession of the shotgun. She also stated that Defendant struck her on the head with the stock of the shotgun. Once in the backyard, she saw Defendant point the shotgun at Mr. Davis, but then Defendant put

6

the shotgun down because it was no longer loaded. Ms. Fontenot ran back through the house and stayed in the front yard until the police arrived.

Ms. Fontenot admitted that on the evening of the incident, in a taped interview, she told the police that Defendant had shot the shotgun twice while she was running away. She also admitted stating that he pulled her back into the house by her hair. She also said that she believed Defendant was going to shoot someone. At trial, Ms. Fontenot indicated that she was the one who pulled the trigger of the shotgun all three times; however, in the taped interview, she stated that after the first shot, Defendant took the shotgun from her, and two more shots were fired. Later in the taped interview, Ms. Fontenot stated that she was uncertain if she was still in the bathroom when the shots were fired or if she was running through the kitchen at that time.

Ms. Fontenot testified that she told Defendant that he could come to the Davis residence to see for himself that their daughter was not there. She stated that she felt that because he did not have a car, he would not actually come to the house.

Mrs. Davis testified at trial; however, Mr. Davis had died by the time of the trial. Mrs. Davis described the first incident in the late morning when Defendant arrived and took his daughter to his house. Mrs. Davis said that after Ms. Fontenot initially told him no but then relented, he told them as he was leaving with the girl, "[I]f I see a cop, I'll cut her throat." Mrs. Davis stated that this was the first time that day she called the police, but Ms. Fontenot refused to press charges.

Mrs. Davis further testified that Ms. Fontenot was in a panic after she got off the telephone with Defendant later in the evening. She said that Ms. Fontenot told her that Defendant had threatened to come to the house and kill everyone. Mrs. Davis

7

stated that when she took the telephone to call the police, she could hear Defendant still yelling on the other end.

Shortly thereafter, Defendant arrived at the Davis residence and began pounding on the back door. Mr. and Mrs. Davis, two of their minor grandchildren, Ms. Fontenot, and her child were all inside the residence at the time. Upon seeing Defendant outside, Mrs. Davis told the children to go into a closet in the master bedroom. Mrs. Davis stated that her husband got his pistol, and she gave Ms. Fontenot a shotgun and told her to go hide in the master bathroom. Mrs. Davis testified that she had locked all three doors to the house because she did not want him in the house. Mrs. Davis stated that as he pounded on the door, Defendant yelled if they did not let him inside, "he was going to torch the place." Defendant kicked the front door open. Mrs. Davis said that after Defendant and Ms. Fontenot ran out the back door, she saw Defendant dragging Ms. Fontenot back toward the house by her hair.

Mr. and Mrs. Davis had also gone outside after they heard shots from the shotgun. Mrs. Davis described how Defendant aimed the shotgun at her as she hid behind a car. She also stated that he threw the gun down, but he continued to walk toward her husband, even after he told Defendant to stop and fired two warning shots into the wall of the garage. Mrs. Davis testified that when Defendant did not stop, her husband shot him just as the police were pulling into the driveway.

Defendant alleges that he was authorized to enter the property and did not have the specific intent to do any of the prohibited acts that he was charged with when he entered the property. He argues that his intent in going to the Davis residence was not to commit a battery or any other felony, but "[i]nstead, the evidence shows, at the

8

most, there was a domestic fight, where a father, angry that the mother was hiding his child on her birthday, stupidly went into her home to confront the mother and to retrieve the child."

The Louisiana Supreme Court has defined an "unauthorized entry" prohibited by the aggravated burglary statute as "an entry without consent, express or implied." *State v. Oritz,* 96-1609, p. 14 (La. 10/21/97), 701 So.2d 922, 931, *cert. denied*, 524 U.S. 943, 118 S.Ct. 2352 (1998) (citing *State v. Dunn*, 263 La. 58, 267 So.2d 193 (1972)). "In the case of a private dwelling, a person must have the consent of an occupant or an occupant's agent to constitute a defense to 'unauthorized entry.'" *Id.*

In the instant matter, Defendant alleges that Ms. Fontenot invited him to come to the Davis residence to check on the whereabouts his daughter. Ms. Fontenot testified that she told Defendant that he could come and see that his daughter was not there, and no one told him that he was unwelcome at the residence or that the police would be called if he came. However, Ms. Fontenot also testified that Defendant told her over the telephone that if he could not get his daughter, he would kill her. Mrs. Davis stated that she had locked all of the doors to the house and yelled through the doors at Defendant that he should leave because she had called the police. Mrs. Davis also stated that Defendant either pounded or kicked the doors to gain entry. She identified photographs which showed the broken frame of the front door still attached to a chain lock that had been pulled from the wall.

Despite Ms. Fontenot's statement that she told Defendant that he could come over, the subsequent acts of Mr. and Mrs. Davis in locking the doors, telling Defendant to leave, calling the police, and Ms. Fontenot hiding herself in the bathroom while armed with a shotgun were sufficient acts to clearly indicate that

9

Defendant was not given consent to enter the property on that occasion. Consequently, there was sufficient evidence presented for the jury to determine that the "unauthorized entry" element of the aggravated burglary statute had been met.

Defendant additionally alleges that he did not have the specific intent to commit a felony when he entered the Davis residence. In *Ortiz*, 701 So.2d at 932, the court stated that a "key element of the crime of burglary is that the accused must have had the intent to commit a felony at the moment of entry." The requisite intent required to be convicted of aggravated burglary is specific intent. *State v. Hennis*, 98-664 (La.App. 1 Cir. 2/19/99), 734 So.2d 16, *writ denied*, 99-806 (La. 7/2/99), 747 So.2d 16. Specific criminal intent exists "when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10. Moreover:

> Specific intent is a state of mind and, as such, need not be proven as a fact, but may be inferred from the circumstances and actions of the accused. The determination of whether the requisite intent is present in a criminal case is for the trier of fact, and a review of the correctness of this determination is to be guided by the *Jackson* standard.

*State v. Petty,* 99-1307, p. 3 (La.App. 5 Cir. 4/12/00), 759 So.2d 946, 949, *writ denied*, 00-1718 (La. 3/16/01), 787 So.2d 301 (citations omitted).

The evidence was sufficient for the jury to conclude beyond a reasonable doubt that Defendant intended to commit at least a battery inside the dwelling. Defendant's day long actions were such that it could reasonably be inferred that he intended to inflict harm upon persons inside the house. In the morning, he slapped Ms. Fontenot and threatened to cut his daughter's throat. When he returned to the house in the evening, despite being told that he was not welcome, he threatened to kill the persons inside the house and kicked down the front door. He threatened to "torch" the house.

10

Once inside the house, he beat Ms. Fontenot with both his fist and the shotgun. Furthermore, the evidence was sufficient for the jury to reasonably find that Defendant armed himself once he was inside the house with a dangerous weapon. Accordingly, the evidence was sufficient to establish that Defendant intended to commit a felony inside the house, thus satisfying those elements of the offense of aggravated burglary beyond a reasonable doubt. Accordingly, there is no merit to this assignment.

## ASSIGNMENT OF ERROR NUMBER 2:

Defendant asserts that the trial court erred when it allowed the jury to hear the four 911 calls made the day of the incident. Defendant argues:

> [the tapes] were not introduced to establish a time line. Nor were they introduced to show why the police responded. Instead, they were introduced to show the truth of the matter asserted. The state, aware that Ms. Fontenot was not going to testify as strongly as it wanted, wanted the tapes to prove its version of the facts. When 911 tapes are introduced to prove the truth of the matter asserted, they are inadmissible hearsay.

The State argues that the tapes were admissible as an exception to the hearsay rule because they were made under the immediate pressure of the crime; were a part of things said and done, pursuant to La.Code Evid. art. 801(D)(4); and the probative value of the tapes was not outweighed by their prejudicial effect.

Defendant filed a Motion to Exclude 911 Tapes, and a hearing was held on said motion prior to the commencement of the trial. At the hearing, addressing specifically the three calls in the evening, Defendant argued that the caller, Mrs. Davis, was only repeating what Ms. Fontenot had told her, i.e., that he was coming over to kill them all. The trial court ruled that the tapes were admissible "because they're, number one (1), business records, number two (2), excited utterances."

11

At trial, the State introduced the 911 tape recorded by the Jefferson Davis Parish Sheriff's Office. There were four separate calls the day of the incident. One occurred in the morning, and three others occurred that night. The call in the morning was made by Mrs. Davis. In the tape, Mrs. Davis stated that Defendant had been at their house and had taken the daughter by force, that he had a gun, and had threatened to shoot the girl. Defendant had left by the time the call was placed. The second call, placed at 9:56 p.m. by Mrs. Davis, requested police presence because Defendant had told Ms. Fontenot that he was coming over to kill them all. Mrs. Davis described the situation, including the morning incident, and told them their location. In the next call, four minutes later, Mrs. Davis essentially repeated what she had stated in the earlier call and urged the police to hurry. In the last call, eight minutes later, Mrs. Davis was screaming that Defendant was breaking down the door. Gun shots could be heard in the background. Then there are shouts, "He's shooting her. He's shooting her."

Defendant objected at trial to the admission of the tapes as hearsay. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted." As noted, the trial court allowed the admission of the tapes as an exception to the hearsay rule because the tapes represented an excited utterance and a business report. Louisiana Code of Evidence Article 803(2) defines an excited utterance as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."

In *State v. Millican*, 03-1065, p. 4 (La.App. 1 Cir. 2/23/04), 874 So.2d 211, 213-14, the first circuit discussed the excited utterance and business record exception to the hearsay rule, as follows:

> The jurisprudence on this issue is not totally consistent. *See, e.g.*, *State v. Brown*, 02-1217 (La.App. 4th Cir.5/28/03), 853 So.2d 8, 14 (court concludes it was error to admit a 911 tape, stating it was clearly hearsay, but further concludes it was harmless error); *compare U.S. v. Bradley*, 145 F.3d 889, 892-94 (7th Cir.1998) (court concludes 911 tape was neither confusing nor prejudicial, holding defendant's challenges on those grounds were insufficient to justify its exclusion); *Bemis v. Edwards*, 45 F.3d 1369, 1372 (9th Cir.1995) (911 tapes admissible as either a public record or a business record, but because citizens making such calls are not under a duty to report, the statements on tapes must also satisfy a separate hearsay exception, such as present sense impression or excited utterance); *U.S. v. Sallins*, 993 F.2d 344, 347-48 (3rd Cir.1993) (even if the 911 record itself is admissible under Federal Rule 803(8), details as to the out-of-court statements made by the person who called 911 were not admissible unless covered by a separate hearsay exception); *State v. Ballos*, 230 Wis.2d 495, 505-07, 602 N.W.2d 117, 122-23 (App.9/21/99), *review denied,* 233 Wis.2d 84, 609 N.W.2d 473 (Wis.2/22/00) (911 tapes reporting fire and arson admissible as present sense impressions, excited utterances, or statements of recent perception exceptions to hearsay); *State v. Parker*, 1997 WL 195922 p. 5, 1997 WL 195922 (*Tenn.Crim.App.*4/23/97) (admission of a 911 tape as a public record was error, even though the contents of the tape qualified as an excited utterance, because the voices on the tape were not identified); *State v. Smith*, 868 S.W.2d 561, 576-77 (Tenn.1993) (affirms admission of 911 tape under excited utterance exception to the hearsay rule).

In the present case, the fourth 911 call from Mrs. Davis, wherein she is heard screaming that Defendant was kicking down the door and the statement, "He is shooting her," was admissible hearsay.

The second 911 call, placed at 9:56 p.m. by Mrs. Davis, requested police assistance because Defendant had told Ms. Fontenot that he was coming over to kill them all. During this call, Mrs. Davis gave the police information regarding Defendant's behavior throughout the day, Defendant's name, and their location. In *State v. King,* 604 So.2d 661 (La.App. 1 Cir. 1992), King asserted that the 911 tape

13

was inadmissible as unnecessary and repetitive since the caller was a witness at trial, as in the present case. However, the first circuit held that the tape was admissible because the tape consisted of the basic report of the request for assistance, which included the location, description of the perpetrators, and other victims involved. In the present case, the tape was relevant since Defendant asserted that he was invited to come over to the house, when in fact as attested to by the 911 caller, Mrs. Davis, he was not authorized to enter the premises.

Finally, the third nighttime 911 call was a repeat of the second call, which could be construed as being unnecessary and repetitive, therefore cumulative.

While the trial court may have erred when it allowed all four of the taped 911 calls to be admitted, such error was harmless. This court finds that there was sufficient evidence without the 911 calls to convict Defendant of the crime of aggravated burglary. Ms. Fontenot testified Defendant threatened to kill everyone in the house. Defendant kicked in a locked door in the house, after he was told to leave, and beat her with both his hands and a shotgun. The circumstances were such that the jury could reasonably infer Defendant's specific intent to commit a felony inside. Moreover, the evidence was sufficient to establish beyond a reasonable doubt that Defendant armed himself with a dangerous weapon once he entered the house. Finally, the caller testified at trial, therefore there was no issue of confrontation and the witness was cross-examined thoroughly. *See Brown*, 853 So.2d 8, and *State v. Hearold,* 603 So.2d 731 (La.1992).

This assignment of error is without merit.

**ASSIGNMENT OF ERROR NUMBER 3:**

Defendant argues that the jury was not allowed to hear pertinent testimony of a defense witness, Rhonda Comeaux, from whose house Defendant had called Ms. Fontenot on the night of the incident. Portions of Ms. Comeaux's testimony were withheld from the jury on hearsay grounds. The withheld testimony included statements by Ms. Comeaux that she was with Defendant when the telephone calls were made on the night of July 4 and that she heard Ms. Fontenot tell Defendant to come to the house and see whether his daughter was there. However, Ms. Fontenot testified herself that she told Defendant he could come over and check, contrary to Defendant's suggestion "the jury never heard the testimony (of Comeaux) that he was invited to check about his daughter." Consequently, we need not consider the admissibility of Ms. Comeaux's testimony for that purpose. Accordingly, there is no merit to this assignment of error.

**ASSIGNMENT OF ERROR NUMBER 4:**

Defendant asserts that he was denied his constitutional right to represent himself at trial. On the morning the trial commenced, prior to *voir dire,* Defendant advised the trial court that he desired to discharge his retained counsel and to represent himself. The trial court had Defendant sworn in and conducted a hearing in compliance with *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525 (1975).

The Louisiana Supreme Court held in *State v. Brown,* 03-897, pp. 28-29 (La. 4/12/05), 907 So.2d 1, 21-22:

> Both the Louisiana and federal constitutions guarantee a criminal defendant's right to the assistance of counsel. *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); *State v. Brooks*, 452 So.2d 149, 155 (La.1984). Nevertheless, a defendant may elect to represent himself if the choice is "knowingly and intelligently made" and the assertion of the right is "clear and unequivocal." U.S. Const.

15

Sixth Amend.; La. Const. art. I, § 13; *Faretta v. California*, 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975); *State v. Hegwood*, 345 So.2d 1179, 1181-82 (La.1977).

In *Faretta*, the United States Supreme Court recognized that a trial court may not force a lawyer upon a defendant when the defendant insists he wants to conduct his own defense and voluntarily and intelligently elects to proceed without counsel. However, he must ask clearly and unequivocally to proceed *pro se* and he must also make his request in a timely manner. *Faretta*, 422 U.S. at 835, 95 S.Ct. at 2541. Further, a defendant must be made aware of the dangers and disadvantages of self-representation so that the record demonstrates that "'he knows what he is doing and his choice is made with his eyes open.'" *Id,* 422 U.S. at 835, 95 S.Ct. at 2541 (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279, 63 S.Ct. 236, 242, 87 L.Ed. 268 (1942)). *Faretta* made clear that the accused's "technical legal knowledge, as such, [is] not relevant to an assessment of his knowing exercise of the right to defend himself." *Id.*, 422 U.S. at 836, 95 S.Ct. at 2541. In *State v. Santos*, this Court held that where a trial judge is confronted with an accused's unequivocal request to represent himself, the judge need determine only whether the accused is competent to waive counsel and is "voluntarily exercising his informed free will." *State v. Santos*, 99-1897, p. 3 (La.9/15/00), 770 So.2d 319, 321 (quoting *Faretta*, 422 U.S. at 835, 95 S.Ct. at 2541).

However, as noted in *State v. Bridewater*, 00-1529, pp. 20-21 (La. 1/15/02), 823 So.2d 877, 896, *cert. denied*, 537 U.S. 1227, 123 S.Ct. 1266 (2003):

Like self-representation, this right cannot be manipulated to obstruct orderly court procedure or to interfere with the fair administration of justice. "Defendant must exercise his right to counsel of his choice at a reasonable time, in a reasonable manner and at an appropriate stage of the proceedings." *State v. Seiss*, 428 So.2d 444, 447 (La.1983). Absent a justifiable basis, "[t]here is no constitutional right to make a new choice of counsel on the very date the trial is to begin, with the attendant necessity of a continuance and its disrupting implications." *State v. Leggett*, 363 So.2d at 436. A trial court's ruling on this issue will not be disturbed in the absence of a clear showing of abuse of discretion. *State v. Cousin,* 307 So.2d 326, 328 (La.1975).

At the hearing, when asked why he desired to discharge present counsel, who had been hired a few months prior to the trial date, Defendant complained that defense counsel tried to talk him into accepting a plea bargain which included an eighteen-year prison term. On examination, Defendant admitted that he already had

16

two prior court appointed defense counsels, one of whom he had attacked in the parish jail which resulted in criminal charges, and the second of whom was discharged prior to present counsel being retained by family members. The trial court did not complete the *Farretta* examination or advise Defendant of the dangers and disadvantages of self-representation. The trial court stated:

> Okay. Well, normally, I would continue with education and ability and--I'm not going to do that. I'm going to view this as a ploy to disrupt the orderly procedure of this Court again as occurred with Mr. Bull, and so I--I do not consider this--I cannot consider this in good faith as a normal everyday run of the mill request to fire my lawyer and get somebody else. So I'm going to deny your motion to fire. I'm going to consider him as your attorney and order that the matter proceed--.

Defendant argues that this issue was not governed by *Faretta* because counsel was a retained counsel, not an appointed counsel, and denial of his request compelled him to accept a lawyer he did not want. Moreover, Defendant argues that he did not ask for a continuance and that he was prepared to go to trial immediately. However, during the hearing, Defendant advised the trial court that he knew that if the trial court granted him his request, he would also get a continuance.

The trial court did not err when it denied Defendant's request. As revealed immediately following the *Faretta* hearing, during a discussion of security in the courtroom, Terry Guillory, warden of the Jefferson Davis Parish jail, testified, "My concerns are that Mr. Brandenburg is going to attempt to postpone this trial by using physical force either on his attorney, on yourself, or--or anyone that he can put his hands on." The trial court correctly found that Defendant was too volatile to have been allowed self-representation and that his actions indicated that his request was made solely to interrupt the orderly proceedings of the trial court.

Accordingly, this assignment is without merit.

17

## ASSIGNMENT OF ERROR NUMBER 5:

Defendant alleges that the trial court erred when it denied his motion for mistrial. Defendant also asserts that the jury pool became contaminated. Defendant states that it was "discovered at the end of the second day of jury selection, that many of the prospective jurors had been involved in discussing the case and Mr. Brandenburg's past, while waiting to be questioned." Defendant argues that the trial court should have granted his motion for a mistrial pursuant to La.Code Crim.P. art. 775, which, in pertinent part, provides that "[u]pon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial."

Defendant correctly states that a Jefferson Davis Parish jailer told various members of the jury about the case and about Defendant's reputation. In *State v. Clark,* 02-1463, pp. 31-32 (La. 6/27/03), 851 So.2d 1055, 1079, *cert. denied*, 540 U.S. 1190, 124 S.Ct. 1433 (2004), the supreme court held:

> La.C.Cr.P. art. 775 requires a mistrial on motion of the defense when "prejudicial conduct inside or outside the courtroom makes it impossible for the defendant to receive a fair trial." However, mistrial is a drastic remedy that is warranted only when the defendant has suffered substantial prejudice such that he cannot receive a fair trial. *Wessinger,* 98-1234 at p. 24, 736 So.2d at 183; *State v. Bates*, 495 So.2d 1262, 1273 (La.1986); *State v. Wingo*, 457 So.2d 1159, 1166 (La.1984). The determination of whether actual prejudice has occurred lies within the sound discretion of the trial judge, and this decision will not be overturned on appeal absent an abuse of that discretion. *Wessinger,* 98-1234 at p. 24, 736 So.2d at 183; *State v. Sanders,* 93-0001, pp. 20-21 (La.11/30/94), 648 So.2d 1272, 1288; *State v. Smith,* 430 So.2d 31, 44 (La.1983).

On the morning of the second day of *voir dire*, Bryant Lee McCrea, a prospective juror, advised the trial court that he was a jailer with the Jefferson Davis Parish and that he knew all about the case and Defendant's reputation. The trial court

dismissed him for cause. When asked, Mr. McCrea testified that he told no one anything about the case or Defendant. However, after lunch, the second panel was called into the courtroom and seated. Ten jurors had been seated by this time. The trial court asked the new panel if they knew anything of the case. Lynard Paul Marceaux advised the trial court as follows:

> I don't know if it means anything, but they had a--they had a fellow in the hall yesterday who was talking to several people and I over heard what the case is about, and he knew the guy, and how he was, and he's been in trouble since he was fifteen (15), and he shot into a closet where they had some children, and got shot in the process."

Mr. Marceaux identified the jailer, Mr. McCrea, as the one who was talking in the hall. He said that Mr. McCrea said that he had to use mace on Defendant several times while he was jailed awaiting trial. The trial court questioned Mr. Marceaux about how many people heard what Mr. McCrea said. Mr. Marceaux indicated several and stated that he had told one person himself. The trial court excused Mr. Marceaux because Mr. Marceaux did not believe that he could be fair in his consideration of the case.

The trial court then again asked the prospective jurors if they had heard anything out in the hall regarding the case. Three persons, who had already been selected as jurors, raised their hands. The trial court and counsel for both the prosecution and defense talked with the three out of the hearing of the rest of the seated and prospective jurors.

David Romero testified that he heard that Defendant was going to drag out the trial. He further stated that he did not believe what he heard would affect his consideration of Defendant's guilt or innocence. Easton Gradney testified that he had heard about a shotgun and kids and that "[t]hey had to use pepper stray [sic] on him

19

several times while he was up here." He testified that several people were talking about it. When asked if it would affect his ability to serve, he answered, "Well, it puts something in the back of your mind." When asked if he observed how many people Mr. McCrea talked to, he stated, "[w]e was--he was moving, you know, pretty regular around the hall there." He stated that he discussed what he had heard with others. William Trahan told the trial court that he had heard that Defendant broke into someone's house and tried to kill someone. He also stated that what he had heard in the hall did not affect his ability to be a juror in the case.

At this point, Defendant moved to dismiss the entire panel as well as the seated jurors. The trial court denied his request. The trial court then excused Mr. Trahan and Mr. Gradney for cause. Mr. Romero was not excused. The trial court again addressed the prospective and seated jurors and stressed the need to inform the court of any little thing that they might have heard outside the courtroom. This time five persons raised their hands, two of whom had already been selected as jurors, Edward Arnold and Sherry Woods. Again, outside of the hearing of the rest of the prospective jurors, the trial court questioned those five people. Charles May told the trial court that right after lunch, one of the prospective jurors started telling him all about the case, but he "shut him down." Mr. May further stated that he would not be affected by what he heard. He said that the person who told him was still out in the hall. Although he did not know his name, he described the man. Next, Doris LeBlanc was questioned. She stated that she had heard the case was about a "robbery -- or maybe a murder. That's all I know." She could not recall from whom she heard this. She further stated that it would not affect her ability to serve as a juror in the case. Edward Arnold spoke next. He stated that, along with two or three other

people, he had overheard Mr. Marceaux talk about the case. He said that he heard "bits and pieces," that someone got shot in the chest, or "somebody being gassed." Mr. Arnold further indicated that what he heard would not affect his consideration of the case. Sherry Woods stated that all she really heard about the case was that the shooting took place behind Lucky D's. She said that she knew the place because she lived in the same town where Lucky D's was located. She said that she had heard about the shooting when it happened because she was from the same town. Finally, Laura Nixon was questioned. She heard that it was a scary case. She stated that perhaps more than twenty people were discussing the case and that she was nervous about serving.

Again, Defendant moved for a mistrial, stating that he had already lost prospective jurors that he wanted and that he had already used ten peremptory challenges. Defendant challenged the previous five persons for cause. The trial court denied the motion, stating that all the persons had adequately indicated that they could put what they heard aside and serve without preconceived notions. Ms. Woods and Mr. Arnold were also allowed to remain as seated jurors for the same reason. The trial court then had all the selected jurors brought into the courtroom and admonished them not to discuss the case with anyone or allow anyone to discuss the case with them. They were then asked to leave the courtroom and the *voir dire* was continued.

Four more persons, including Ms. LeBlanc and Ms. Nixon were accepted as jurors, and one alternate juror was picked. Eight more names were pulled from the panel to pick the last alternate juror. Again, the trial court asked if anyone had been approached, talked to, or heard any discussion about the case. Of these last eight people, three raised their hands. Out of the hearing of the remaining panel, Damiana

21

Chapman stated that she had heard something a few days prior to commencement of trial from a relative of the deceased Mr. Davis concerning Defendant, and she had overheard people talking in the hall outside the courtroom. She stated that there were two persons, a female in an officer's uniform, whose conversation she could not readily hear, and a woman who told her and a few others about how Defendant threw things at her. Ms. Chapman was excused for cause. Michael Soileau stated that, in the hall, he had heard something about a shooting. However, he was excused for cause for other reasons. Finally, Ann Arceneaux told the trial court that she heard various groups of people discussing what the case was about. She heard that Defendant had a reputation. She also stated that she could serve objectively as a juror. Defendant used a peremptory challenge to excuse her.

The second alternate juror was picked and the trial proceeded.

Despite the State's assertions to the contrary, five persons who had overheard conversations regarding Defendant and the case were either allowed to remain on the jury or subsequently selected: Mr. Arnold, Ms. Woods, Mr. Romero, Ms. Nixon, and Ms. LeBlanc. However, as noted above, the trial court discussed with each juror whether they could be objective in the case, and all assured the trial court they could put aside what they had heard in the hall and make a decision based solely on the evidence.

In *State v. Roman,* 473 So.2d 897 (La.App. 3 Cir. 1985), this court dealt with the issue of a jury exposed to information regarding the case and the accused prior to trial. This court reversed the conviction. The accused was charged with forcible rape, crimes against nature, and simple robbery. After jury selection, the trial court gave instructions to the jury; however, the trial court failed to instruct the jury not to

read, listen to, or watch any news coverage. That same day, an article was published in the local paper that revealed the accused had several prior convictions for the same crimes for which he was being charged. Five jurors admitted that they had read the article. The trial court questioned each juror separately and admonished them individually to disregard what they had read and to judge solely on the evidence. This court stated:

> In *State v. Russell,* 416 So.2d 1283 (La.1982), the Louisiana Supreme Court, when faced with a problem of jury exposure to prejudicial publicity, enunciated a standard by which to judge whether a mistrial is warranted:
>
>> "A mistrial is not warranted absent a determination that the jurors were actually exposed to the publicity in question and were so impressed by it as to be incapable of rendering a fair and impartial verdict. LSA-C.Cr.P. Art. 775; *State v. Monk*, 315 So.2d 727 (La.1975). Here questioning by the trial judge of each juror showed that none of the jurors had been even exposed to the newspaper article complained of, much less prejudiced thereby. (The trial judge had consistently warned the jurors during the trial to avoid contact with any of the press accounts thereof.)"
>
> Unlike the situation in Russell, five jurors in the case presently before the court were actually exposed to the publicity. Further, they had not been warned by the trial judge to avoid contact with publicity concerning the case.
>
> While the trial judge did question each juror, and admonished those who had read it to disregard the article, we believe that the references to the defendant's previous convictions were too prejudicial to be overcome by a mere admonishment. We believe that there was a substantial possibility that the jurors who had this knowledge were unable to be impartial, thereby denying the defendant a fair trial. As a result, La.C.Cr.P. art. 775 mandates that a mistrial be granted. Accordingly, we reverse the conviction and remand this case to the trial court for a new trial.

*Id.* at 899-900.

This court again dealt with the issue of a potentially tainted jury in *State v. Surratt*, 05-1406 (La.App. 3 Cir. 6/7/06), 932 So.2d 736, finding the accused did not suffer substantial prejudice because of the alleged contamination. The jury panel heard rumors while waiting in the hall for *voir dire* of a knife being smuggled into the jail where the accused was being held. One juror reported the rumor to the trial court, stating he was not sure he could be objective. The trial court talked to all the seated jurors individually and questioned them.

> The trial court then called in the seated jurors individually and questioned them. Janice Deculus informed the court that she heard an officer say that the courthouse was searched around 7:00 the previous day. While waiting for the elevator, Joann Matte heard a guard tell a court employee that he was watching the driveway "because something about a knife was passed to somebody." Matte was not sure whether the people were discussing the case at bar. LeBleu told the trial court that "[t]hey talked about what they had done" and made jokes about Surratt. LeBleu indicated that "a couple of old men" were making jokes. She further stated the following: "there were deputies by Mr. Coreil's office leading into this door and they were all laughing, I don't know exactly who said anything but they were all joking." The record reflects that twenty-four other jurors had not heard any discussion between potential jurors or security personnel or anything that concerned Defendants.

*Id.* at 753.

The accused moved for a mistrial stating there was no way for the trial court to ferret out the taint from the jury. However, this court stated:

> In *State v. Daniels*, 32,017 (La.App. 2 Cir. 5/5/99), 740 So.2d 691, *writ denied,* 99-1599 (La.11/12/99), 749 So.2d 651, after the first day of voir dire, but before the jury was sworn, a prospective juror who had not been questioned informed defense counsel that another prospective juror who had been questioned told her and other prospective jurors that the defendant would not have been charged had he not been guilty and that his mind was made up. The prospective juror who made the remarks admitted that he had done so and the trial court excused the prospective juror on its own motion. The trial court, thereafter, questioned each prospective juror individually. Of the prospective jurors who heard the comment, only one admitted he could not be fair and impartial. The trial court, on its own motion, excused that juror. On appeal, the defendant contended that the trial court erred

24

in failing to grant his motion for mistrial based on the prejudicial comment. Our colleagues on the second circuit noted that the remaining jurors in the matter swore to accept the law as given. The trial court instructed the jurors on the presumption of innocence, the burden of proof necessary to sustain a conviction, and the evidence which could not be considered in reaching a verdict. The appellate court then found that the trial court did not err in denying the defendant's motion for a mistrial.

The case at bar is clearly distinguishable from *Roman*. The prospective jurors in this matter did not learn about Surratt's criminal record. They merely heard rumors regarding a shank and saw increased security at the court. In that regard, the instant case is similar to *Daniels*. In this case, the trial court questioned potential jurors on the panel at the time the issue arose and was satisfied that the jury venire was not tainted. Out of the twenty-eight people questioned, Surratt points to four of those potential jurors as possibly being tainted, and only one of those, Deculus, actually served on the jury. Surratt has not proven substantial prejudice such that he did not receive a fair trial. Consequently, we cannot say that the trial court abused its vast discretion in denying his motion for mistrial. Accordingly, this assignment of error lacks merit.

*Id.* at 754.

In the current case, several prospective jurors had heard that Defendant was "maced" several times. They heard that Defendant had a "reputation." They also heard certain facts of the case: someone was shot, Defendant broke into a house, and he fired a shotgun at a closet full of children. Unlike *Roman,* they were not exposed to the fact that he had prior convictions of the same nature as the charges he was currently facing. However, as in *Roman,* the prospective jurors were not admonished by the trial court not to discuss anything concerning Defendant or the case until the second day of *voir dire.*

The questions we must consider are: Were the jurors who heard the comments so impressed by them as to be incapable of rendering a fair and impartial verdict? Did Defendant suffer substantial prejudice? Several of the jurors, both seated and excused, mentioned that they knew of the case or Defendant because they lived in the

25

same town as Defendant and that they had heard about the incident at the time it occurred. As noted by the trial court:

> All I've heard is that whoever was involved--and I'm not going to put a number on it--heard language to the effect that the defendant was charged with doing some particular acts. Now, it is a --it is a fact that most jurors don't live in a vacuum. Most jurors know a little bit usually about the case, because if your--your position would be correct, we'd never get a jury. The pivotal issue is can they lay it aside, and I'm convinced.

Out of more than thirty prospective jurors who were questioned, twelve heard the comments. Of the twelve, five were seated, and all five were extensively questioned by the State, Defendant, and the trial court. All five stated that they could be objective when considering the evidence.

In *State v. Hundley,* 99-1156, p. 11 (La.App. 3 Cir. 3/22/00), 760 So.2d 417, 423, while discussing challenges for cause when a juror is exposed to pretrial publicity, this court quoted guidance as set out by the Louisiana Supreme Court in *State v. Goodson,* 412 So.2d 1077, 1081 (La.1982), as follows:

> Both the degree of exposure and the prospective juror's testimony as to state of mind are relevant to the determination of acceptability. A prospective juror testifying to an inability to overcome preconceptions shall be subject to challenge for cause no matter how slight the exposure. If the prospective juror remembers information that will be developed in the course of the trial, or that may be inadmissible but does not create a substantial risk of impairing judgment, that person's acceptability shall turn on the credibility of testimony as to impartiality. If the formation of an opinion is admitted, the prospective juror shall be subject to challenge for cause unless the examination shows unequivocally the capacity to be impartial. A prospective juror who has been exposed to and remembers reports of highly significant information, such as the existence or contents of a confession, or other incriminating matters that may be inadmissible in evidence, or substantial amount of inflammatory material, shall be subject to challenge for cause without regard to the prospective juror's testimony as to state of mind.

In the present case, the information received by the jurors was not such that would create a substantial risk of impairing judgment. Some of the information was developed at trial: an unauthorized entry into an inhabited dwelling, Defendant was shot, and a shotgun blast went into a closet where children were hiding. The prospective jurors who expressed chagrin at this exposure were excused for cause. As to whether Defendant had a bad reputation, this was, at least, a rumor like the rumor of a knife smuggled into the jail in *Surratt.*

In the present case, we cannot say the trial court abused its considerable discretion when it denied Defendant's motion for a mistrial. In *State v. Hunter,* 551 So.2d 1381 (La.App. 3 Cir. 1989), this court found that no substantial prejudice occurred when five jurors read a newspaper article that discussed the case and revealed that the accused had escaped from jail at one point and was a convicted felon. Since the accused did not testify, this information would have been inadmissible. Further, as in the present case, the trial court failed to admonish jurors not to read anything regarding the trial. This court stated:

> In this case, both the trial judge and the attorneys individually questioned each juror who had seen the article. Each stated that he or she was not so impressed by the article as to be incapable of rendering a fair and impartial verdict. Additionally, this court has reviewed the article which was admitted into evidence on defendant's motion for mistrial. We do not find the article to be too prejudicial to be overcome by a mere admonition by the trial judge. As a result, the trial judge did not abuse his discretion in refusing to grant the mistrial.

*Id*. at 1385.

There is no merit to this assignment of error.

**ASSIGNMENT OF ERROR NUMBER 6:**

For his sixth assignment of error, Defendant asserts that the maximum sentence of thirty years at hard labor is constitutionally excessive under the circumstances of

the case. Defendant was convicted of aggravated burglary, a violation of La.R.S. 14:60, which provides for a range of imprisonment from no less than one nor more than thirty years.

> The trial court has wide discretion in imposing a sentence, and a sentence imposed within the statutory limits will not be deemed constitutionally excessive absent a manifest abuse of discretion. *State v. Evans*, 97-504 (La.App. 3 Cir. 10/29/97); 702 So.2d 1148, *writ denied*, 97-2979 (La. 4/3/98); 717 So.2d 231. This court, in *State v. Dubroc,* 99-730, p. 22 (La.App. 3 Cir. 12/15/99); 755 So.2d 297, 311, noted:
>
> > The relevant question on review of a sentence is whether the trial court abused its broad sentencing discretion and not whether the sentence imposed may appear harsh or whether another sentence might be more appropriate. *State v. Cook*, 95-2784 (La.5/31/96); 674 So.2d 957, *cert. denied,* 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996). To constitute an excessive sentence, this court must find the penalty imposed is so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals; and, therefore, it is nothing more than needless imposition of pain and suffering. *State v. Campbell*, 404 So.2d 1205 (La.1981). The trial court is given wide discretion in imposing a sentence, and a sentence imposed within statutory limits will not be deemed excessive in the absence of manifest abuse of discretion. *State v. Pyke*, 95-919 (La.App. 3 Cir. 3/6/96); 670 So.2d 713.

*State v. Boudreaux,* 00-1467, p. 12 (La.App. 3 Cir. 4/4/01), 782 So.2d 1194, 1201, *writ denied*, 01-1369 (La. 3/28/02), 812 So.2d 645 (quoting *State v. Dubroc*, 99-730, p. 22 (La.App. 3 cir. 12/15/99), 755 So.2d 297, 311). "As a general rule, maximum sentences are appropriate in cases involving the most serious violation of the offense and the worst type of offender." *State v. Hall,* 35,151, p. 4 (La.App. 2 Cir. 9/26/01), 796 So.2d 164, 169.

At the sentencing hearing, the trial court heard testimony from Ms. Fontentot, Defendant's girlfriend and the mother of his thirteen-year-old daughter. Ms. Fontenot

28

asked the trial court for leniency for the sake of his daughter and because Defendant

had been recently diagnosed with diabetes. Following a statement made by

Defendant and defense counsel, and after a recitation of the facts of the case, the trial

court ruled as follows:

> It--it's not a question to me of if you're to be imprisoned, it's a question of how long since--as--as the following comments will indicate, you will probably commit another crime when released based on past experience. Your entire life behavior, as--as I'll mention hereafter, requires a custodial environment now--from now on, you know, for your own good, and especially for the good of society, and any lesser sentence than that which I'm about to impose would just deprecate the seriousness of your crime.

> The Pre-Sentence indicates that you admitted problems with the rules of conduct in life as a juvenile. You described yourself as uncontrollable and incorrigible. A review of the records confirms this assessment. In your short adult period that you've enjoyed so far, you been convicted, sir, on four (4) different occasions of felonies involving crimes against the person, August 18, 86; August 22, 87, July 9, 92, June 20, 98. A total of some twenty-something years imposed, and you're just now--what, you're forty-three (43), will be forty-four (44) shortly. Additionally, you've been convicted of a number of misdemeanors that placed others in danger for--for the most part. May of 84, receiving stolen things. August 18th, 86, two (2) counts simple battery, simple criminal damage, simple battery. October 3, 91, disturbing the peace. February the 3rd, 92, disturbing the peace. February the 3rd, 92, disturbing the peace. May the 9th, 92, resisting arrest, disturbing the peace. Additionally, from 84 through date, you've had a--a tremendous number of other charges NPO'd or dismissed following--well, many of them--following pleas or convictions. You have pending charges, the companion charges of the instant case, a -- pending charge against your previous attorney. I just -- I just have a -- a very serious problem.

> You're--you're--you're a very -- so far as I can tell, you're -- you're a very intelligent person. You're the father of two (2), a daughter, twenty (20), and a daughter, thirteen (13). You've had a -- what is termed by yourselves-- a common-law relationship with Toinette since 93. You've got a GED. You haven't worked very much 'cause you've been in prison most of your life. You say you're in poor health, a type II diabetic, bipolar disorder by diagnosis from a nurse practitioner, a torn rotor [sic] cuff, some vision problems, a hernia, lung damage from the gunshot that you mentioned, pins in your hand, but, sir, many people have health problems. Most people don't break the law because of those problems.

The -- the only person to step to the plate today other than your attorney who did it as a professional courtesy was Toinette on your behalf, and I have to remind you, sir, that on the night in question, she gave a statement voluntarily, full of details to law enforcement at the scene, and in the heat of the moment, she told what actually happened. It bears no resemblance to what later on she tried to say because of your relationship with her.

You are a fifth offender with pending charges. You created a risk of death. You used threats. You followed up with actual violence. You used a dangerous weapon. There were multiple victims. You have persistently been involved in similar offenses. A firearm was discharged. You've used physical force against persons and property. None of the victims in this case did anything to provoke this. The mitigation offered pales -- just absolutely pales in comparison. I have no choice. I -- I lay awake at night because of what I have to do, but I have to do it until I decide it's time to take the black dress off, and I haven't decided that yet.

So, sir -- and I've looked at some of the cases -- similar cases in the books bearing some similarities to what is presented, and I'll mention just a few: State versus Thompson, 894 So.2d 1268; State versus Haley, 873 So.2d 747; State versus Loyd, 810 So.2d 1214. This penalty that I am imposing is -- is required under the circumstances.

Defendant argues:

Under the specific facts of this case, this sentence violates the constitutional prohibition against excessive sentences. The offense stemmed from a domestic dispute over visitation rights, and a father attempting to find a hidden child. He harmed no one, and he threaten [sic] no one. He was shot, and nearly killed. After a careful reading of the record, one gets the impression, Mr. Brandenburg was given the maximum sentence, not because of the offense, but because of the perceived difficulty with him during the trial of this matter.

While the record did reflect that Defendant was extremely disruptive during the trial and sentencing, the trial court did not abuse its considerable discretion when it sentenced Defendant to thirty years at hard labor considering the circumstance of the case and Defendant's criminal history. As noted by the trial court, Defendant is a five-time felony offender and has an extensive arrest record. In *State v. Thompson*, 39,454, 39,455 (La.App. 2 Cir. 3/2/05), 894 So.2d 1268, cited by the trial court in the

present case as a comparison, Thompson was convicted of aggravated burglary and received the maximum sentence of thirty years. The second circuit affirmed the sentence, noting that Thompson was a four-time felony offender and had a lengthy criminal past. The second circuit further stated, "Defendant was the worst type of offender. The crimes were committed in a manner that endangered the lives of several people and with total disregard for public safety. . . it was clear that [Thompson] had not benefitted from his previous incarcerations and that, this time, he would be sent away to serve the interest of public safety." *Id.* at 1285.

Under the circumstances of the case as set forth by the trial court above and considering Defendant's extensive criminal history, Defendant's maximum sentence was not such that would shock this court's sense of justice. Accordingly, there is no merit to this claim.

## *PRO SE* ASSIGNMENT OF ERROR NUMBER 1:

For his first *pro se* assignment of error, Defendant asserts that "[t]he trial court denied appellant of the right to a fair trial by allowing the Jury to take a copy of unknown material into the jury room to read while deliberating on a verdict. . .and for giving improper instructions to the jury relative to charged offense not included within the responsive verdict."

After the jury began deliberations, it sent two notes to the trial court. The first note requested a review of the definition of aggravated burglary. The second note requested review of the definitions of "intent to commit a felony," "attempted aggravated burglary," and "simple burglary." The note further asked for a clarification of "felony," and "when does 'battery' become a felony?" After discussion and agreement with defense counsel and the State, the trial court decided

31

to allow the jury to have a copy of the jury charges which contained the above definitions and to read to the jury the definition of battery. The trial court was inclined to read just the definition of battery, since "a battery" was all that was required by the aggravated burglary statute. However, both defense counsel and the State wanted all the pertinent degrees of battery read to the jury. The trial court agreed.

The trial court read the definitions of battery, simple battery, aggravated battery, second degree battery, and aggravated second degree battery to the jury. The jury then, with a copy of the pertinent jury charges as requested above, went back into the jury room.

Defendant argues that battery was not a responsive verdict to aggravated burglary; therefore, the trial court erred when it read the definitions to the jury. However, this court finds that there was no error on the part of the trial court. The definitions were not given to the jury as a responsive verdict, but in response to their request for a clarification. As noted above, battery was an optional element of the offense. *See* La.R.S. 14:60(3). While we agree with the trial court that a reading of the definition of battery would have sufficed, Defendant did not object to the reading of the applicable degrees of battery to the jury. "An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence." La.Code Crim.P. art. 841.

Moreover, the jury did not take "unknown material" into the jury room. The jury was given a copy of the pertinent part of the jury charges for their clarification. Defendant points to La.Code Crim.P. art. 793, which limits what evidence the jury may take into the jury room. Defendant further cites *State v. Adams,* 537 So.2d 1262

32

(La.App. 4 Cir. 1989)[1], wherein the jury was permitted to examine the accused's confession. However, in the present case, the jury charges were not evidence. Moreover, as noted above, Defendant did not object to the charges being given to the jury for their clarification at the time. Accordingly, the alleged error was not preserved for appeal, and thus, there is no merit to this assignment of error.

## *PRO SE* ASSIGNMENT OF ERROR NUMBER 2:

Defendant asserts that "[t]he trial court denied appellant the right of a fair trial by denying him a continuance on the morning of trial when the District Attorney amended the Grand Jury Indictment."

Louisiana Code of Criminal Procedure Article 489 provides:

> If it is shown, on motion of the defendant, that the defendant has been prejudiced in his defense on the merits by the defect, imperfection, omission, uncertainty, or variance, with respect to which an amendment is made, the court shall grant a continuance for a reasonable time. In determining whether the defendant has been prejudiced in his defense upon the merits, the court shall consider all the circumstances of the case and the entire course of the prosecution.

The district attorney has complete authority to amend indictments, both as to form and substance, at any time before trial. *State v. Pitree,* 05-1513 (La.App. 3 Cir. 5/3/06), 930 So.2d 265. Trial does not begin until the first prospective juror is called for questioning. La.Code Crim.P. art. 761.

The Grand Jury Indictment charged Defendant with one count of attempted second degree murder, violations of La.R.S. 14:27 and 14:30.1, one count of aggravated battery, a violation of La.R.S. 14:34, one count of possession of a firearm by a convicted felon, a violation of La.R.S. 14:95.1, and one count of aggravated

---

[1]We note that the Louisiana Supreme Court granted a writ in this case at 543 So.2d 2 (La.1989) and that the judgment was affirmed in part and reversed in part at 550 So.2d 595 (La.1989).

burglary, a violation of La.R.S. 14:60. The language for the aggravated burglary charge read as follows:

> [Defendant] [d]id unlawfully commit aggravated burglary of the dwelling of Jesse Davis by entering the dwelling without authority, with the intent to commit a felony therein, and further, did arm himself with a dangerous weapon to with [sic]: a shotgun, after entering (a felony) in violation of LSA R.S. 14:60.

The definition of an aggravated burglary includes either/or provisions as follows:

> [T]he unauthorized entering of any inhabited dwelling, or of any structure, water craft, or movable where a person is present, with the intent to commit a felony or any theft herein, if the offender,
>
> > (1) Is armed with a dangerous weapon; or
>
> > (2) After entering arms himself with a dangerous weapon; or
>
> > (3) Commits a battery upon any person while in such place, or in entering or leaving such place.

The language, "or committed a battery upon a person while in such place, or in entering or leaving such place," was added to the indictment on the morning of trial before *voir dire* commenced. The State informed the trial court the portion of the charge concerning the weapon "will remain intact."

Defendant asked for a continuance, arguing he was taken by surprise. The State responded:

> MR. LAPOINT: Judge, this is not the defense's first notice. In fact, the defendant is also charged with an aggravated battery in another charge in the same bill that has been severed for--well, will be severed for trial purposes, so there is no--there's no merit to the allegation that this is any surprise to the defense, and under the--the Code, Judge--I was looking for the articles, but the--the Court has the discretion to amend this bill at any time prior to trial.

34

The State argued that since the charge of aggravated battery required the use of a dangerous weapon as set forth in La R.S. 14:34, and until the morning of trial, Defendant was also going to have to defend against that charge, there was no surprise or prejudice to Defendant's case because of the addition of the battery provision of the aggravated burglary statute.

The trial court overruled Defendant's objection, stating "I--I think all we're doing here is making more precise, in accordance with the facts, the charge. We're not changing anything. Mr. Brandenburg will not be tried for some kind of new crime other than what we've got before us."

We agree with the trial court. Defendant was prepared to defend against the aggravated battery charge, which was severed from the trial following the amendment to the indictment. Therefore, there was no surprise or additional charge added which prejudiced Defendant's case. There is no merit to this assignment.

### *PRO SE* ASSIGNMENTS OF ERROR NUMBER 3 and 4:

These two assignments of error are not properly before this court. The allegations raised by Defendant apparently concern a "Motion to Dismiss Charges Without Prejudice" filed by the State after the verdict and sentence were rendered, and after Defendant's appellate record was filed with this court.

Defendant was originally charged by a bill of information with the above-discussed offenses under Parish of Jefferson Davis District Court docket number 04-678, on August 4, 2004. He was then indicted for the same offenses under Parish of Jefferson Davis District Court docket number 04-969 on December 13, 2004. Defendant was tried under docket number 04-969 for the aggravated burglary, the remaining charges having been severed as discussed above.

In the motion, the State moved to dismiss all the charges contained in docket number 04-678, and all the charges except for the aggravated burglary charge under docket number 04-969, without prejudice "and reserving the State's right to re-institute said charges within the prescribed prescriptive periods should it deem it necessary to pursue these charge in the event the defendant Brandenburg's prior felony conviction for Aggravated Burglary should be overturned on appeal."

In brief, Defendant claims he filed a Motion to Quash on October 9, 2006. He states that "[i]n lieu of the Motion to Quash filed by Appellant the District Attorney filed a motion to dismiss without prejudice the aggravated burglary offense under item #2004070031 and case no. 678-04; 969-04." Defendant asserts the State dismissed the aggravated burglary charge of which he was convicted. Therefore, Defendant asserts the conviction and sentence are null and void.

Except for the "Motion to Dismiss Charges without Prejudice," none of these subsequent pleadings mentioned by Defendant are in the record before this court. It is further noted that there is no ruling on the State's motion to dismiss included in the record, nor is there anything in the record indicating the matter of Defendant's Motion to Quash has gone before the trial court. Accordingly, there is nothing before this court to address concerning these issues.

Defendant also asserts that the time limitation for institution of prosecution on the companion charges has lapsed pursuant to La.Code Crim.P. art. 578; therefore, the State cannot reinstate the charges. While there may be merit, in part, to this allegation, still the issue is not properly before this court on appeal. Accordingly, these assignments need not be addressed.

36

## DECREE

Defendant's conviction and sentence on the charge of aggravated burglary are affirmed.

**AFFIRMED.**